EASTMAN KODAK COMPANY,
Plaintiff,

v.

Susana KAVLIN, and Casa Kavlin
S.A., Defendants.

Juan Jose CARBALLO, Plaintiff,

v.

Susana KAVLIN, and Casa Kavlin
S.A., Defendants.

Nos. 96–2218–CIV, 96–2219–CIV.

United States District Court,
S.D. Florida.

Sept. 9, 1997.

Landon K. Clayman, Baker & McKenzie, Miami, FL, Lawrence W. Newman, David Zaslowsky, Baker & McKenzie, New York City, for Plaintiffs.

Edmund T. Henry, III, Rene J. Gonzalez–Llorens, Shutts & Bowen, Miami, FL, for Defendants.

### ORDER GRANTING IN PART AND DE-NYING IN PART DEFENDANTS' MOTIONS TO DISMISS

RYSKAMP, District Judge.

THIS CAUSE came before the Court upon defendants' motions to dismiss [DE 18 in 96–2218; DE 21 in 96–2219], filed October 2, 1996.[1] The two defendants in this case, the corporation Casa Kavlin and the individual defendant Susana Kavlin, move to dismiss the two complaints on four separate grounds—a) want of personal jurisdiction over the corporation, b) forum non conveniens as to all claims, c) failure to state a claim upon which relief can be granted as to the claims against Casa Kavlin arising under Bolivian law and d) failure to state a claim upon which relief can be granted as to plain-

1. For purposes of convenience, the Court will treat together the similar motions in these relat-ed cases.

tiff Carballo's claims arising under the Alien Tort Claims Act. For the reasons stated below, the Court will retain jurisdiction over the case, dismiss some of Kodak's claims arising under Bolivian law, and defer ruling on the personal jurisdiction issue pending an evidentiary hearing.

## I. *BACKGROUND*

Plaintiffs tell a gripping story filled with international corporate intrigue, corrupt South American judges presiding over kangaroo courts, rat-infested prisons where survival depends on bribery, and a Bolivian judge's tawdry affair resulting in an embarrassing love child. Defendants tell a less dramatic story about an ordinary commercial dispute between a distributor and a supplier that ended up in the wrong court. They contest many aspects of plaintiffs' story, and plaintiffs contest many aspects of theirs. The Court cannot decide between these competing stories on these motions to dismiss. It can only try to make some sense out of the legal issues arising from the competing allegations. The facts are these.

Between 1923 and the events precipitating this litigation, Casa Kavlin, a Bolivian company with its principal place of business in La Paz, served as the exclusive Bolivian distributor for Kodak, an internationally recognized photography equipment manufacturer. Casa Kavlin works the Bolivian photographic equipment wholesale and retail markets, distributing such goods as photographic laboratory equipment, films, graphic arts materials, x-ray materials, and microfilm. The company has no sales outside of Bolivia, although it does procure many of its materials from the United States, including Florida.

According to the allegations of the two complaints, in January of 1995, Kodak was becoming dissatisfied with Casa Kavlin's distribution services and sent Juan Carballo, a citizen of Uruguay, to Bolivia to survey the market for Kodak products in Bolivia. Approximately two months after Carballo and his family arrived in Bolivia, Kodak informed Casa Kavlin that it would no longer serve as the exclusive distributor of Kodak products in Bolivia. Instead, Carballo would be responsible for Kodak sales, supplies distribu-

tion, and representation in Bolivia. Casa Kavlin's response to this change in the parties' relationship is the subject of this lawsuit.

No one disputes that Casa Kavlin, acting through its Executive Vice President, Susana Kavlin, filed a written criminal complaint against Carballo in La Paz on May 9, 1995. The complaint accused Mr. Carballo of various crimes under Bolivian law, such as falsifying documents, espionage against Casa Kavlin, stealing Casa Kavlin's clients, and the like. Defendants insist that they acted properly because Carballo's actions threatened their Bolivian distributorship rights and violated Bolivian criminal laws. They claim that the prosecutor received evidence from various Bolivian governmental agencies demonstrating that the corporation Carballo purported to represent was fictitious and unregistered with the proper authorities, in violation of Bolivian law. Additionally, the prosecutor allegedly had evidence that Carballo had failed to register with various tax collecting agencies and had failed to obtain a required work permit.

Carballo and Kodak vigorously deny wrongdoing by Carballo. Instead, they insist that Casa Kavlin brought the charges in order to extort an advantageous financial arrangement with Kodak. Here their story takes its first sordid turn. Enter Juan Carlos Zegarra, the attorney representing Casa Kavlin, and, according to plaintiffs, an attorney notorious in Bolivia for bringing criminal charges in purely civil disputes. Plaintiffs charge, and defendants do not dispute, that Zegarra is the godfather of Instructional Judge Grover Nájera Quiroga's ("Judge Nájera") illegitimate child. Apparently, Zegarra's sister conceived the child during an affair with Judge Nájera. Zegarra then became the child's "padrino" or godfather. This matters because plaintiffs allege that after filing the criminal charges Zegarra used his connections in the Bolivian criminal justice system to have the case assigned to Judge Nájera, who would surely give a sympathetic ear to the godfather of his child. Plaintiffs allege that this relationship between Zegarra and Judge Nájera casts a

sinister pall over the judge's subsequent actions.

Responding to the criminal complaint, Judge Nájera issued a warrant for Carballo's arrest. Carballo was arrested on May 27, 1995, and was brought before Judge Nájera for interrogation. The judge allegedly questioned Mr. Carballo for two hours, in the process revealing an overwhelming bias in favor of Casa Kavlin. Ultimately, Judge Nájera ordered him detained in San Pedro prison in La Paz without bail. Plaintiffs allege that the only charged offense which could have resulted in an immediate incarceration was the sabotage charge, a crime so far removed from any possible aspect of Carballo's work for Kodak as to make the incarceration decision the obvious product of an extortion scheme.

According to Carballo, a waking nightmare followed. The San Pedro prison in downtown La Paz, the "infamous Panóptico" according to one of plaintiffs' experts, is apparently a place barely fit for the rats it houses. For eight days, Carballo was forced to stay there, sharing a filthy cell with murderers, drug dealers, and AIDS patients. Left without food, a blanket, or protection from the inmates, he was forced to bribe his way to survival. Prisoners ran the prison, and murdered each other in Carballo's presence on one occasion. Dangerous drug dealers discussed their deals in his presence, potentially making him someone who "knew too much." Finally, Carballo was able to buy the right to live in a jail cell for $5,000, but even then he had to sleep on the floor. Although the authorities eventually released him, Carballo claims that the experience left him deeply traumatized and unable to resume life as before.

Around May 30, 1995, Alejandro Quintana, a Chilean lawyer, learned of Carballo's imprisonment and went to Bolivia on Kodak's behalf to seek his release. While Mr. Carballo was still confined, Susana Kavlin allegedly informed Quintana that Casa Kavlin would agree to drop the charges against Carballo if Kodak would agree (1) to remove all of is representatives from Bolivia, (2) not to send any more representatives to Bolivia, and (3) within sixty days of Mr. Carballo's release to either (a) terminate its relationship with Casa Kavlin, subject to compensation to Casa Kavlin, (b) sign an agreement with Casa Kavlin for an exclusive distributorship of Kodak products in Bolivia, or (c) purchase Casa Kavlin. Kodak alleges that it agreed to Kavlin's demands in order to secure Mr. Carballo's release. Casa Kavlin denies that it used Carballo's imprisonment to extort a settlement with Kodak. It claims that it dismissed the criminal charges after being contacted by the United States embassy and receiving assurances from Kodak that neither Carballo nor any other Kodak employee would act as distributor in Bolivia pending resolution of the distributorship dispute within the next sixty days.

However it happened, Carballo was released from his detention in the "Panóptico" after eight to ten days and was able to leave Bolivia. But according to Kodak, Casa Kavlin's abuse of the Bolivian criminal justice system did not end there. In September of 1996, Mr. Quintana learned that he had been added as a criminal defendant in the ongoing case against Carballo, even though he had done nothing at all in Bolivia other than to secure Carballo's release. Additionally, (still according to plaintiffs) Casa Kavlin managed to have two other Kodak employees, the general manager of Kodak, Chilena Claudio Villarnio, and Carballo's supervisor, Thomas Pescond, charged as criminal co-conspirators of Carballo's. Plaintiffs further allege that by the working of some corrupt hand, the cases against these four defendants—Carballo, Quintana, Villarnio, and Pescond—were assigned to the former husband of Zegarra's sister, Judge Enrique Solares del Castillo, who convicted the four men in absentia, even on the incredible sabotage charges, and sentenced them to five years in prison.

Casa Kavlin has now brought suit against Kodak in Bolivia, seeking to recover $10,000,000.00 on the basis of this allegedly coerced agreement. Kodak has sued Susana Kavlin and Casa Kavlin before this Court, alleging various theories arising under Bolivian law, including extortion, false accusation and denunciation, exercise of monopoly of work, and a declaratory judgment that Casa Kavlin is not entitled to the relief it seeks in its Boliv-

ian complaint. Mr. Carballo has sued the same defendants, alleging that their misconduct in having him imprisoned as part a scheme of extortion violated "the law of nations."

Defendants' motions to dismiss have been pending since October of 1996 to allow the parties discovery on the personal jurisdiction and *forum non conveniens* issues. The Court has previously issued a protective order limiting the scope of discovery to those two issues pending resolution of the motions to dismiss.

## II. *LEGAL STANDARD*

A motion to dismiss should not be granted unless the plaintiff can prove no set of facts in support of its claim entitling it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). When considering a motion to dismiss, the Court must accept all the Plaintiffs' allegations as true. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint need only be "a short and plain statement of the claim," and, as long as the pleadings "give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests," notice pleading has been satisfied. *Conley v. Gibson,* 355 U.S. at 47, 78 S.Ct. at 102–03.

## III. *DISCUSSION*

In moving to dismiss, defendants raise four separate grounds: personal jurisdiction, *forum non conveniens,* failure to state a claim under Bolivian law, and failure to state a claim under the Alien Tort Claims Act. These issues are largely independent, and only the *forum non conveniens* argument has the potential of disposing of all the claims in both lawsuits. The Court will consider each of these claims in turn.

## A. Personal Jurisdiction Over Casa Kavlin

Defendant Casa Kavlin, a Bolivian corporation, has moved to dismiss both Kodak and Carballo's complaints against it, arguing that this Court lacks jurisdiction over its person.[2] Casa Kavlin argues that it is a Bolivian corporation that does business only in Bolivia, and that the contacts it has with the State of Florida are so insignificant as not to subject it to the reach of Florida's long-arm statute or to personal jurisdiction under the constitutional "minimum contacts" requirement. Plaintiffs dispute these allegations, arguing that Casa Kavlin has availed itself of the benefits of this state, and is fully subject to suit in this forum.

On the basis of the discovery relating to personal jurisdiction in this case, the parties have filed competing outlines of Casa Kavlin's contacts with the State of Florida that they think are relevant. The Court is unable to determine the full extent of Casa Kavlin's contacts with the State of Florida on the present record. Accordingly, this matter will be set for an evidentiary hearing.

## B. Forum Non Conveniens

■ Under the doctrine of *forum non conveniens,* " 'when an alternative forum has jurisdiction to hear [a] case, and when trial in the chosen forum would establish ... oppressiveness and vexation to a defendant ... out of all proportion to plaintiff's convenience, or when the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems, the court may, in the exercise of its sound discretion, dismiss the case,' even if jurisdiction and venue are established." *American Dredging Co. v. Miller,* 510 U.S. 443, 447–48, 114 S.Ct. 981, 985, 127 L.Ed.2d 285 (1994) (*quoting Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241, 102 S.Ct. 252, 258, 70 L.Ed.2d 419 (1981)). In *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947), the Court de-

**2.** Plaintiffs served Susana Kavlin with process while she was in Florida. She does not dispute that this service sufficed to subject her to the jurisdiction of this Court. *See Burnham v. Superior Court,* 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990) (plurality opinion) (service of process upon defendant while physically present in territory of forum state suffices to establish personal jurisdiction).

scribed some of the factors that should weigh in the district court's decision: the private interest of the litigant, ease of access to sources of proof, availability of compulsory process, the possibility of viewing any relevant premises, the enforceability of potential judgments, and various public interest factors. The Eleventh Circuit has distilled some of these general guidelines into a four-part test:

As a prerequisite, the court must establish whether an adequate alternative forum exists which possesses jurisdiction over the whole case. Next, the trial judge must consider all relevant factors of *private* interest, weighing in the balance a strong presumption against disturbing the plaintiff's initial forum choice. If the trial judge finds this balance of private interests to be in equipoise or near equipoise, he must then determine whether or not factors of *public* interest tip the balance in favor of a trial in a foreign forum. If he decides that the balance favors such a foreign forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience of prejudice.

*La Seguridad v. Transytur Line,* 707 F.2d 1304, 1307 (11th Cir.1983) (*quoting Pain v. United Technologies Corp.,* 637 F.2d 775, 784–85 (D.C.Cir.1980) (emphasis in original), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981)). Distilling these principles even further, we can say that the four parts of the test are: a) an adequate alternative forum, b) balance of private interests, c) balance of public interests, and, d) lack of undue inconvenience or prejudice to the plaintiff.[3]

■ Plaintiffs' choice of forum is entitled to a strong presumption of suitability, and defendants must bear the burden of overcoming that presumption by establishing every element necessary to demonstrate *forum non conveniens.* *Nowak v. Tak How Investments, Ltd.,* 94 F.3d 708, 719 (1st Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1333, 137 L.Ed.2d 493 (1997); *Peregrine Myanmar, Ltd. v. Segal,* 89 F.3d 41, 46 (2d Cir. 1996); *Reid–Walen v. Hansen,* 933 F.2d 1390, 1393 (8th Cir.1991); *Lacey v. Cessna Aircraft Co.,* 862 F.2d 38, 43–44 (3d Cir. 1988). The Court finds that defendants easily bear their burden as to the balance of public and private interests. The first and last criteria, which the Court will treat together, present a more difficult question.

■ Plaintiffs make a perfunctory effort to deny that the public and private interest at issue support dismissal of the two complaints on the grounds of *forum non conveniens.* The Court finds, to the contrary, that defendants have easily met their burden on these prongs of the test. First, as to the private interests, the Court would note that everything connected with this case happened in Bolivia. The seventy-year relationship between Kodak and Casa Kavlin occurred solely in Bolivia, which was also the cite of Mr. Carballo's imprisonment, the negotiations to secure his release, the subsequent criminal prosecutions of Messrs. Quintana, Villanio, and Pescond. The vast majority of the witnesses reside in Florida.[4] If the lawsuit were to take place in the United States, almost all relevant documents would have to be translated into English, and interpreters would be required for many, if not most,

---

**3.** The two separate lawsuits, Carballo's and Kodak's, involve two separate jurisdictional bases, diversity and the Alien Tort Claims Act. Theoretically, the *Kodak* case should be decided under Florida's doctrine of *forum non conveniens* while the *Carballo* case should be decided under the federal standard. As defendants note, the Florida Supreme Court has now adopted the federal *forum non conveniens* standard. *Kinney Sys., Inc. v. Continental Ins. Co.,* 674 So.2d 86 (Fla. 1996). Despite the *Kinney* decision, there remains some question whether the federal and Florida standards are identical. *See Fletamentos Maritimos, S.A. v. Maritima Albatros, S.A., Inc.,* 944 F.Supp. 906 (S.D.Fla.1996) (Ryskamp, J.).

Nonetheless, the Court finds that the issues raised by defendants' motions are similar enough to be treated together under the federal and state standards.

**4.** Plaintiffs argue that they may not have access to compulsory process over all of the witnesses in Bolivia. Be that as it may, defendants are in a far worse to position to defend these claims in the United States, where not only would the cost of bringing witnesses to the United States be exorbitant, but defendants would be without any compulsory process to require the appearance of Bolivian witnesses in Florida.

witnesses. All claims in the *Kodak* case arise under Bolivian law; thus extensive translation and expert testimony as to the meaning of Bolivian law would be necessary were the lawsuit to proceed in Florida. The only factor tending to cut in plaintiffs' favor is that the Bolivian system tends to be less generous with discovery than does the American system. This factor, standing alone, does not suffice to rebut a claim of *forum non conveniens. See In re Union Carbide Corp. Gas Plant Disaster*, 809 F.2d 195, 205–06 (2d Cir.), *cert. denied*, 484 U.S. 878, 108 S.Ct. 35, 98 L.Ed.2d 167 (1987). The Court concludes that, on balance, defendants have met their burden of proving that the private interests of the parties cut heavily in favor of adjudicating this dispute in Bolivia.

■ The public interest factors support a finding of *forum non conveniens* even more strongly. Most of the relevant legal issues arise under the laws of Bolivia. The entire contractual relationship between Kodak and Casa Kavlin took place in Bolivia. Most importantly, the alleged wrongdoing with regard to Mr. Carballo directly implicates the integrity of Bolivia's criminal and civil justice systems, as well as its penal system. As the Court has previously commented, entertaining plaintiffs' claims will involve this Court in sitting in judgment upon the alleged corruption of a nation's entire legal system. If Bolivia's courts do not have a surpassingly greater interest in their own integrity than do the American courts, then the public interest factor is meaningless. The Court therefore finds that both the public and private interest factors weigh in defendants' favor.

■ This brings us to the first and fourth criteria, the availability of an adequate alternative forum and the lack of prejudice to the interests of the plaintiff. In this case, these factors converge. Plaintiffs essentially argue that the Courts of Bolivia are so corrupt and slow as to make fair and timely resolution of their claims highly unlikely. Furthermore, they repeat their allegations concerning the special influence that Casa Kavlin has over the Bolivian justice system

and the company's willingness to wield its power ruthlessly to Kodak's detriment. The existence of an adequate alternative forum is a necessary predicate to a dismissal under the doctrine of *forum non conveniens. Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1429 (11th Cir.1996). Thus, success in this argument would mean that these cases could not be dismissed under the doctrine of *forum non conveniens.*

The "alternative forum is too corrupt to be adequate" argument does not enjoy a particularly impressive track record. The Court has been unable to locate any published opinion fully accepting such an argument. By contrast, a number of courts have rejected this position, for a variety of reasons. *See Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 981 (2d Cir.1993) (refusing, despite charges of corruption, to find Venezuelan courts an inadequate alternative forum where parties' contract contained a forum selection clause naming Venezuela as parties' forum of choice); *Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345, 1351 (1st Cir. 1992) (finding Turkey to be an adequate alternative forum despite plaintiff's claim that Turkish courts had a profound bias against Americans and foreign women), *cert. denied*, 508 U.S. 912, 113 S.Ct. 2346, 124 L.Ed.2d 255 (1993); *Torres v. Southern Peru Copper Corp.*, 965 F.Supp. 899, 903 (S.D.Tex.1996) (finding that Peruvian judicial system was not so corrupt as to render Peru an inadequate alternative forum), *aff'd*, 113 F.3d 540 (5th Cir.1997); *Banco Mercantil, S.A. v. Hernandez Arencibia*, 927 F.Supp. 565, 567 (D.Puerto Rico 1996) (rejecting claim that courts of Dominican Republic were so corrupt as to provide an inadequate alternative forum); *see also Chesley v. Union Carbide Corp.*, 927 F.2d 60, 66 (2d Cir.1991) ("It is not the business of our courts to assume responsibility for supervising the integrity of the judicial system of another sovereign nation. Such an assumption would directly conflict with the principle of comity ....") (*quoting Jhirad v. Ferrandina*, 536 F.2d 478, 484–85 (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976)).[5] There is

---

5. In two cases known to this Court, the courts appeared to give some weight to the corruption

argument, but explicitly decided the *forum non conveniens* issue on a different ground. In *Sho-*

a substantial temerity to the claim that the forum where a party has chosen to transact business, especially for seventy years as Kodak did in Bolivia, is inadequate. As Justice Holmes noted in *Cuba R.R. Co. v. Crosby,* 222 U.S. 473, 480, 32 S.Ct. 132, 133, 56 L.Ed. 274 (1912), in upholding the application of Cuban tort law to the plaintiff's tort claim, "it should be remembered that parties do not enter into civil relations in foreign jurisdictions in reliance upon our courts. They could not complain if our courts refused to meddle in their affairs and remitted them to the place that established and would enforce their rights." *See also Mercier,* 981 F.2d at 1351 ("[I]t is not unfair that a plaintiff's conclusory claims of social injustice in the foreign nation where she deliberately chose to live, work, and transact the business out of which the litigation arises should be accorded less than controlling weight in the selection of a judicial forum for the related litigation.") (citations omitted). Absent a compelling counter-indication, the Court would be inclined to hold that, having made its bed in Bolivia, Kodak should lie there too.

In this case, however, the counter-indications are compelling indeed. Whatever inhibitions the Court may feel about declaring the Bolivian justice system too corrupt to permit fair adjudication of plaintiffs' claims are substantially diminished by the Bolivian Minister of Justice's own comments about the system he supervises. A Bolivian newspaper article published September 20, 1996, quotes the Minister of Justice as saying that "the current judicial system is a collection agency and the penal system an agent of extorsion [sic]." Plaintiff's Memorandum in Opposition to Defendant's Motion for Protec-

*nac Corp. v. Marquesa Int'l Corp.,* 1988 WL 50601 (D.N.J.), a case handled by present plaintiff's counsel and involving one of present plaintiff's experts, the court expressed some doubt as to whether Brazil would constitute an adequate alternative forum, apparently due in part to the plaintiff's claims of corruption. *Id.* at * 3. In *Hatzlachh Supply Inc. v. Savannah Bank of Nigeria,* 649 F.Supp. 688, 692 (S.D.N.Y.1986), the court considered the claim that Nigeria was "filthy, contaminated, lawless, and corrupt," but then decided the *forum non conveniens* issue on the public and private interest prongs.

**6.** Plaintiffs also submit evidence that the Bolivian legal system is marked by significant delays. Mr.

tive Order Ex. B (plaintiff's translation). He adds that "[t]he administration of justice in the nation, in many cases, is clouded by the intrusion of powerful pressures by political and economic groups...." *Id.* As a *prima facie* matter, the Court would find this to be compelling evidence that Bolivian system may not be suitable for the adjudication of plaintiffs' claims.

Plaintiffs go much further in developing an extensive record demonstrating substantial problems with sending these cases back to Bolivia. Citing World Bank and State Department reports identifying widespread corruption in the Bolivian courts, Professor Keith S. Rosenn of the University of Miami Law School attests that "[t]he Bolivian judiciary is notoriously corrupt [and] unusually susceptible to improper outside influence." Rosenn Aff. ¶ 12. Professor Eduardo A. Gamarra of Florida International University states:

> Apart from the problems associated with a politicized system, bribery of judges, attorneys, and even Supreme Court Justices is a routine practice. In this sense, if parties want to move cases quickly through the system it is best to grease the wheels of justice. Bribery ranges from relatively small to extremely high amounts.... In 1991, eight members of the Supreme Court were charged with acts of corruption.

Gamarra Dec. ¶ 10. Luis Peñarana, a Bolivian attorney and former legal counsel to the Bolivian House of Representatives judicial oversight commission, adds that "[c]orruption is endemic to the judicial system of Bolivia," existing "at all levels of the system." Peñarana Dec. ¶ 7.[6] A recent report by the State

Peñarana believes that, on average, civil matters take five years to reach judicial resolution. Peñarana Dec. ¶ 12. The federal courts have generally not given great weight to claims of delay in considering the adequacy of the alternative forum. *See Manela v. Garantia Banking, Ltd.,* 940 F.Supp. 584, 591 n. 11 (S.D.N.Y.1996) (rejecting claim that possible delay of three or more years in Brazilian courts rendered Brazilian forum inadequate); *Simcox v. McDermott Int'l, Inc.,* 152 F.R.D. 689, 695 (S.D.Tex.1994) (possibility of two to three year delay in United Kingdom did not render alternative forum inadequate); *Neo Sack, Ltd. v. Vinmar Impex, Inc.,* 810 F.Supp. 829, 834 (S.D.Tex.1993) (possibility of delay in Indian courts insufficient to invalidate alterna-

Department, as cited in Kodak's complaint, provides the following description of the Bolivian justice system:

> The justice system ... is overburdened, afflicted by the corruption of some judges, and lacking public credibility.... Judges are underpaid, poorly disciplined, and susceptible to political influence.... The civilian judiciary is legally independent, but major political parties influence the judicial selection process and decisions in particular cases.

Country Reports on Human Rights Practices for 1995 (Report Submitted to U.S. Senate Committee on Foreign Relations and the House Committee on International Relations, Apr. 1996), at p. 524, cited in Complaint ¶ 8.

These claims of about the general nature of the Bolivian system come against the backdrop of plaintiffs' allegations of abusive influence-peddling by Casa Kavlin in the filing of criminal charges against Carballo and the other Kodak employees. In light of the claims of plaintiff's experts, these claims appear plausible at least. A World Bank report cited by Professor Rosenn states that "[t]he ineffectiveness of the civil courts has also led to the abuse of criminal proceedings as a means to achieve enforcement of commercial obligations." Rosenn Aff. ¶ 27. Professor Gamarra and Mr. Peñarana confirm that this practice is common. Gamarra Dec. ¶ 9; Peñarana Dec. ¶ 13. In summary, Professor Gamarra states that "[t]he system of justice in Bolivia has been an extremely powerful tool for politically powerful or wealthy individuals to blackmail opponents, business competitors, or simply those with fewer economic means." Gamarra Dec. ¶ 12.

Defendants admit that Bolivia's judicial system has been plagued with problems in the past, but claim that at least Professor Gamarra's conclusions do not reflect the changes effected by the restructuring of the system in 1994. Additionally, they note that the American judicial system has not been wholly free from corruption, bribery, and the like, and that the mere existence of some corruption in the Bolivian system should not eliminate that forum, which is otherwise a far better one for this lawsuit than the Southern District of Florida. The Court is not unsympathetic to this argument. Certainly, corruption can and does manifest itself in every court system, including our own. The degree, extent, and apparent lack of redressibility for individual litigants, however, makes the allegations about Bolivia particularly troubling. But most importantly, plaintiffs do not simply argue that the Bolivian system is corrupt in general. They argue, with strong supporting evidence, that the system is easily manipulable by the well-connected and that extortionate use of the criminal justice system is routine in ordinary commercial cases. Furthermore, they allege that Casa Kavlin is well-connected and has already used the criminal justice system to extort a commercial settlement from Kodak, at the price of a nightmarish prison experience for Mr. Carballo, and the conviction in absentia and sentencing of Carballo and three other Kodak employees. More serious still, they allege that Casa Kavlin is likely to continue to use its influence if this case is litigated in Bolivia. This allegation, if true, would certainly make the Bolivian forum inadequate, and demonstrate substantial prejudice to Kodak and Carballo if they had to litigate in Bolivia.

Defendants vigorously deny manipulating the Bolivian justice system to their advantage, and claim that the four Kodak employees against whom criminal charges were lodged had all committed crimes under the laws of Bolivia. Resolving this issue at this juncture places the Court in an awkward

---

tive forum); cf. *Sablic v. Armada Shipping,* 973 F.Supp.745 (S.D.Tex.) (finding that Croatia was not an adequate alternative forum because of possibility of delay resulting from significant backlog of cases). Obviously, this question must be one of degree. As the Third Circuit explained in *Bhatnagar v. Surrendra Overseas, Ltd.,* 52 F.3d 1220, 1227–28 (3d Cir.1995), while "delays of a few years [are] of no significance in the *forum non conveniens* calculus, .... [a]t some point ... the prospect of judicial remedy becomes so temporally remote that it is no remedy at all." In that case, the court held that a potential delay of 25 years in India's courts could render the Indian forum inadequate. *Id.* at 1228. Although five years is perhaps longer than resolution would take in this Court, the Court cannot say that it renders the Bolivian courts inadequate. Accordingly, the Court gives little weight to this factor.

position. To a large degree, the very merits of the case are bound up in the allegations regarding Mr. Zegarra's activities on behalf of Kodak. Without a full trial on the merits, the Court is hardly in a position to determine what actually happened. At this point, the parties present so many contested portrayals of the events, so many differing interpretations of Bolivian law, and such widely divergent accounts of what awaits Kodak and Carballo if they return to Bolivia that absent protracted hearings entailing the very sort of witness testimony, cross-examination, and inspection of documents that trial eventually will involve, the Court cannot draw a conclusive judgment as to which side (if either) is telling the true story.

Of course, the Court does not have the luxury of simply deferring any examination of the competing allegations until trial. The Court must make some judgment at the present. Without determining any issues of fact, the Court would make the following observations: Bolivian law and practice obviously differs significantly from American law and practice. Just because Bolivia makes certain commercial wrongs criminally punishable when the United States would consider them to be ordinary adjuncts of a commercial relationship subject only to civil suit does not in itself make Bolivia an inadequate forum. But plaintiffs' allegations, supported as they are by the compelling expert declarations and State Department and World Bank publications, raise a substantial question about the propriety of Casa Kavlin's dealings. That not only Mr. Carballo, but Messrs. Quintana, Villarnio, and Pescond, should be prosecuted and sentenced in absentia to five years in prison leaves serious doubts about Kodak's ability to operate in Bolivia free from the threat of prosecution, and even immediate imprisonment.[7] Viewed in light of the expert declarations, plaintiffs' story is plausible at least.

Importantly, defendants bear the burden of proving that the alternative forum is available, and that defendants will not be unjustly prejudiced if they have to litigate in Bolivia. On the *forum non conveniens* issue, this case comes down to the deference to be given the plaintiffs' choice of forum. Trial may well prove that Kodak has invented or exaggerated the risk it faces in litigating in Bolivia, and that Casa Kavlin acted blamelessly. But for now, the Court can only rule that defendants have not met their burden of proving the existence of an adequate alternative forum to hear plaintiffs' claims. The motions must therefore be denied on the basis of the *forum non conveniens* arguments.

## C. Failure to State a Claim Under Bolivian Law

Kodak's complaint contains four counts. The first count—indemnity for illegal acts—arises under the Bolivian Civil Code. The second two counts—false accusation and monopoly of work—arise under the Bolivian Criminal Code. In the final count, Kodak seeks a declaratory judgment as to its rights under its distributorship agreement with Casa Kavlin. In moving to dismiss, Casa Kavlin argues that the first count should be dismissed because Kodak fails to allege that Casa Kavlin did any illegal act cognizable under the civil statute, that the second two counts should be dismissed because this Court cannot enforce Bolivian criminal law, and that the declaratory judgment count should be dismissed because there is an actual controversy currently being litigated in Bolivia's courts, and therefore that declaratory judgment would be improper.

 Count I arises under Article 984 of the Bolivian Civil Code, which provides: "Whoever, with an intentional or negligent act, causes an unjust damage to someone, is obligated to make indemnification." Kodak alleges that through the use of violence, threats of violence, defamation, dissemination of false information, defendants conducted a campaign to prevent Kodak from selling its products in Bolivia. Defendants argue that this count must be dismissed because the

---

**7.** Defendants argue that plaintiffs have presented no evidence that the Bolivian *civil* justice system is corrupt so as to affect the viability of a civil lawsuit in Bolivia. However, assuming that plaintiffs are correct in claiming that civil litigants routinely use criminal proceedings to extort favorable outcomes, as they allege Casa Kavlin has already attempted to do in this case, the distinction between the civil and criminal justice systems loses much of its force.

civil code's "act" requirement cannot be satisfied by demonstrating that the defendant merely filed a lawsuit against the plaintiff. Defendant's Exhibit C (Affidavit of Juan Zegarra) ¶ 86. Kodak responds that the filing of an abusive lawsuit for an improper or illegal purpose can give rise to liability under Article 984. Aff. of Dr. Martorell Rosa. Defendants dispute this characterization of Bolivian law.

The Court need not (and really cannot) decide at this juncture whether the simple act of filing a complaint with a wrongful purpose triggers liability under Article 984. Kodak not only alleges that defendants filed a false complaint, but also alleges that "by use of violence, threats of violence, defamation and dissemination of false information ... the Defendants have conducted a campaign to deny Kodak access to the Bolivian market for film and other products produced by Kodak." Complaint ¶ 25. The Court finds that, under the liberal pleading standards of the Federal Rules of Civil Procedure, Kodak has stated a claim under Article 984 of the Bolivian Civil Code.

Defendants next argue that Count II, false accusation and denunciation, and Count III, exercise of monopoly of work, should be dismissed because they arise under the Bolivian Criminal Code. The false accusation count arises under Criminal Article 166 and 283 which provide:

Anyone who knowingly accuses or denounces another of being the author or a participant in an offense of public action which the latter did not commit and which results in initiation of the corresponding criminal proceedings, shall be subject to imprisonment from one to three years.

and;

Anyone who by any means falsely charges another with the commission of an offense, shall be subject to imprisonment from six months to two years and a penalty of one hundred to three hundred days.

Count III arises under criminal Article 304, which provides:

Anyone exercising any type of monopoly of a lawful laboral, business or industrial activity, shall be subject to imprisonment from one to three years and a penalty of thirty to sixty days.

Defendants argue that these counts should be dismissed: a) because this Court cannot enforce foreign criminal laws, b) because this Court cannot, sitting civilly, deprive the defendants of their liberty, c) because under Bolivian law only a criminal court can impose criminal penalties, and d) as to Count II, because a defendant can only be convicted under Article 166 if the person against who charges were initiated was subsequently acquitted of the charges.

■ Quite clearly, this Court lacks jurisdiction to enforce foreign criminal laws. Plaintiffs do not argue to the contrary. Rather, they argue that, under Bolivian law, the specified criminal acts are also "wrongful acts" cognizable in a civil suit under Article 984 of the civil code. The problem with this theory is that Counts II and III then become redundant of Count I, which already alleges a civil action arising under Article 984 of the Civil Code. In essence, plaintiffs ask that the Court entertain three separate counts arising under Article 984 of the Civil Code, even though the second two counts are styled as though they arise under the Bolivian Criminal Code. Although the Court sees no constitutional impediment to adjudication of a *civil* cause of action arising under the laws of a foreign nation where the relevant *civilly* remediable misconduct is defined by reference to a foreign criminal statute, Counts II and III are currently alleged to arise under the Criminal Code. Accordingly, the Court will dismiss them without prejudice.[8]

■ Finally, defendants seek dismissal of Count IV, which asks the Court to enter a declaratory judgment regarding the parties' rights under the distributorship agreement. Defendants argue that since there is a continuing actual controversy about this exact issue currently being litigated in the Bolivian

---

8. Since the Court will dismiss Counts II and III without prejudice, it will not presently address defendants' contention that the false denunciation count cannot be maintained due to Carbal-lo's conviction of the underlying criminal charges. Defendants may wish to revisit this issue if Kodak moves to amend the complaint to replead Counts II and III under the Civil Code.

courts, the entry of a declaratory judgment by this Court would be improper. Plaintiffs respond that the "first filed" rule only applies between two courts of the same sovereignty, and that there is no impediment to adjudication of the parties' rights under the distributorship agreement even though a parallel action is running its course a hemisphere away. Be that as it may, the Court will decline jurisdiction to enter a declaratory judgment in this matter.

It has long been the rule that the federal district courts enjoy considerable discretion to decline to hear declaratory judgment actions concerning matters already pending in state court. In *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942), Justice Frankfurter explained the rationale of this rule:

> Ordinarily it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties. Gratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided.

*Id.* at 495, 62 S.Ct. at 1175–76. When presented with a suit brought under the Declaratory Judgment Act, the district court should ask "whether the questions in controversy between the parties to the federal suit, and which are not foreclosed under the applicable substantive law, can better be settled in the proceeding pending in the state court." *Id.* If the answer to this question is yes, the Court should dismiss or stay the case, and allow the relevant issues to be resolved in state court.

A recent decision of the Supreme Court further explains the district court's function in confronting declaratory judgment suits containing issues also pending in state court. In *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287–90, 115 S.Ct. 2137, 2143–44, 132 L.Ed.2d 214 (1995), the Court explained that the decision whether or not to grant declaratory relief is discretionary with the district courts, and should only be reviewed for abuse of discretion. The Court specifically abrogated Eleventh Circuit precedent holding that the district court's decision to decline jurisdiction would be reviewed *de novo*. *Id.* at 280, 115 S.Ct. at 2140, *abrogating Cincinnati Ins. Co. v. Holbrook*, 867 F.2d 1330, 1333 (11th Cir. 1989). The Court further held that the standard in declaratory judgment cases is not the "exceptional circumstances" test of *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 818–20, 96 S.Ct. 1236, 1246–47, 47 L.Ed.2d 483 (1976) and *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), but a case-by-case evaluation of a case's fitness for declaratory judgment given the pendency of a related state court action. 515 U.S. at 285–89, 115 S.Ct. at 2142–43.

Obviously, neither *Brillhart* nor *Wilton* applies directly to the present facts. In those cases, the Supreme Court permitted the federal courts to decline to issue a declaratory judgment when a parallel state court proceeding would resolve the underlying issues. The cases do not disclose whether this abstention doctrine applies to foreign proceedings. Nonetheless, the Court sees no reason why it should not. It is well established that in the interests of comity a federal court may decline to issue a declaratory judgment concerning matters pending in an Indian tribal court, which is, after all, a species of foreign court. *Kerr–McGee Corp. v. Farley*, 115 F.3d 1498, 1507–08 (10th Cir.1997). Additionally, the Court has located at least one published decision in which a district court dismissed a declaratory judgment action seeking an adjudication of rights bound up in a previously filed action in a foreign nation. In *Basic v. Fitzroy Engineering, Ltd.*, 949 F.Supp. 1333 (N.D.Ill.1996), the court dismissed the American plaintiff's declaratory judgment action finding that the plaintiff essentially was attempting to render null and void a possible future New Zealand judgment, a judgment which "may never come to pass." *Id.* at 1337, *citing American Fidelity & Cas. Co. v. Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co.*, 280 F.2d 453, 461 (5th Cir.1960). The contingency of the future foreign judgment made the quest for a declaratory judgment one not founded upon an Article III "case or controversy," as required for the existence of federal jurisdic-

tion. *Id.* at 1338. Furthermore, the court found that the interests in fostering international comity and preventing forum shopping weighed in favor of declining jurisdiction to issue a declaratory judgment under the *Brillhart* and *Wilton* doctrine. *Id.* at 1339.

The Court finds the reasoning of the *Basic* opinion persuasive. Quite clearly, Kodak has sought a declaratory judgment in this Court in order to preempt the effect of a possible adverse judgment in Bolivia. Under such circumstances, a federal court should stay its hand. The declaratory judgment count is dismissed.[9]

## D. Alien Tort Claims Act

The Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, gives the Court jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." This statute presumably is based upon Congress' power under Article I, section 8 to "define and punish ... Offenses against the Law of Nations." As the Court noted in a previous order, although the constitutional text permits Congress to "define and punish," the ATCA punishes, but does not define. This raises some interpretative challenges for courts entertaining ATCA suits. "The law of nations" means many things to many people.

Carballo charges Susana Kavlin with falsely accusing Carballo of certain crimes and of conspiring with the Bolivian criminal authorities and the presiding judge to secure his arbitrary and inhumane detention. Complaint ¶¶ 32–34. Defendants respond that these allegations do not state a claim under the ATCA because Kavlin was not a state actor and because even if the facts occurred as stated, defendants did not violate the law of nations.[10] The ATCA issue, then, raises two questions: a) does the "law of nations" prohibit conspiring to bring about arbitrary and inhumane detention,[11] and b) may a private person be held liable under the ATCA for her complicity in bringing about an arbitrary and inhumane detention?

The Supreme Court has yet to favor us with an interpretation of the ATCA. Opinions about the statute's original meaning vary from the quite narrow, *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 814 (D.C.Cir.1984) (Bork, J., concurring) (statute extends only to such torts as would have violated law of nations in 1789, such as piracy and injuries to ambassadors), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); Joseph M. Sweeney, *A Tort Only in Violation of the Law of Nations*, 18 Hastings Int'l & Comp. L.J. 143 (1994) (alien tort clause was designed exclusively to provide jurisdiction over a narrow category of prize cases), to the quite broad. William S. Dodge,

9. There is a certain amount of awkwardness in dismissing the declaratory judgment count under principles of international comity and simultaneously denying the motion to dismiss under the doctrine of *forum non conveniens* for failing to demonstrate the existence of an adequate alternative forum. Nonetheless, the Court is not at liberty to fashion a generalized "just solution" to this entire case. The declaratory judgment and *forum non conveniens* issues are formally distinct. Whereas the adequacy of the alternative forum raises a factual matter concerning the relationship of the adverse parties (upon which defendants bear the burden of proof), the abstention doctrine raises an institutional matter concerning the relationship of this Court to the Bolivian court. Whether or not Bolivia's courts can adequately adjudicate the distributorship dispute, they had jurisdiction over the matter before this Court did, and this Court wields no prerogative to disturb that jurisdiction.

10. Defendants also dispute Carballo's account of the facts, and argue that since he was represent-

ed by counsel at his arraignment, and that since his imprisonment accorded with Bolivian substantive and procedural law, his detainment was neither arbitrary nor unjustified. The Court believes that while this may be a strong factual defense to Carballo's complaint, it is more in the way of a denial of plaintiff's factual allegations than legal argument for dismissal of the Complaint. Carballo charges that whatever the facial appearance of the procedures against him, he was locked away for eight or ten days solely because of a conspiracy to detain him in order to extort an economic settlement from Kodak. Thus, the arbitrariness element appears not only in the procedures, but in the motivation and lack of good cause for the detention. The accuracy of his account must await trial or summary judgment.

11. The Court will treat the false accusations and conspiracy to detain claims as part of a single wrong—conspiracy to cause the unjustified and arbitrary detainment of an individual.

*The Historical Origins of the Alien Tort Statute: A Response to the "Originalists,"* 19 Hastings Int'l & Comp. L.J. 221, 256 (1996) (ATCA is "a dynamic provision that provides a federal remedy for all torts in violation of the laws of nations"). In a recent opinion, the Eleventh Circuit appeared to indicate that it would follow the Second Circuit's seminal, though not uncontroversial, *Filartiga* opinion. *Abebe–Jira v. Negewo,* 72 F.3d 844, 846 (11th Cir.) (*citing with approval Filartiga v. Pena–Irala,* 630 F.2d 876 (2d Cir. 1980)), *cert. denied,* —— U.S. ——, 117 S.Ct. 96, 136 L.Ed.2d 51 (1996); *see also Linder v. Portocarrero,* 963 F.2d 332, 336 (11th Cir. 1992) (citing *Filartiga* with approval). According to *Filartiga,* a court must apply the law of nations "not as it was in 1789, but as it has evolved and exists among the nations of the world today." 630 F.2d at 881; *see also Abebe–Jira,* 72 F.3d at 848 (ATCA "establishes a federal forum where courts may fashion domestic common law remedies to give effect to violations of customary international law.").[12] "[W]here the nations of the world have demonstrated that the wrong is of mutual, and not merely several, concern, by means of express international accords, [ ] a wrong generally recognized becomes an international law violation of within the meaning of the statute." *Filartiga,* 630 F.2d at 888; *see also In re Estate of Ferdinand Marcos, Human Rights Litigation,* 25 F.3d 1467, 1475 (9th Cir.1994) ("Actionable violations of international law must be of a norm that is specific, universal and obligatory."), *cert. denied,* 513 U.S. 1126, 115 S.Ct. 934, 130 L.Ed.2d 879 (1995); *Forti v. Suarez–Mason,* 672 F.Supp. 1531, 1540 (N.D.Cal.1987) (ATCA only extends to violations of "universal, definable, and obligatory international norm[s]."), *reconsideration granted,* 694 F.Supp. 707 (N.D.Cal.1988). Thus, plaintiffs must demonstrate that international law, whether contained in universal custom or convention, prohibits conspiring to cause the arbitrary and inhumane detention of an individual for reasons entirely unrelated to the state's legitimate penological interests.

■ The conspiracy prong of this inquiry raises the state action issue, which defendants believe constitutes a basis for dismissal of the complaint. Plaintiffs and defendants argue at some length whether, or to what extent, state action is necessary for a violation of the law of nations. The Second Circuit recently held that no state action is required. *Kadic v. Karadzic,* 70 F.3d 232, 239 (2d Cir.1995) ("[C]ertain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals."), *cert. denied,* —— U.S. ——, 116 S.Ct. 2524, 135 L.Ed.2d 1048 (1996). This, however, is a little beside the point. Undeniably, the state of Bolivia *did act* in confining Mr. Carballo for eight or ten days. The question is whether plaintiffs have sufficiently alleged that defendants participated in that action so as to make them liable for the act of the State. Stated otherwise, the question is whether the ATCA makes a private actor liable in tort for conspiring with state actors to violate the law of nations.

As a matter of initial impression, the Court believes that it would be a strange tort system that imposed liability on state actors but not on those who conspired with them to perpetrate illegal acts through the coercive use of state power. Although the negative prohibitions of our own Constitution generally extend only to state action, those who conspire with state actors to invade the constitutional rights of others may be held liable along with the state actors. *Dennis v. Sparks,* 449 U.S. 24, 27–28, 101 S.Ct. 183, 185–87, 66 L.Ed.2d 185 (1980) (otherwise private person acts "under color of state law" for purposes of 42 U.S.C. § 1983 when engaged in conspiracy with state officials to deprive another of federal rights). Of course, just because our constitutional distinctions are drawn one way does not mean that we have to draw the same distinctions under the ATCA. On the other hand, there is some authority for the proposition that the ATCA reaches conspiracies so long as some state actor is involved. *Hilao v. Estate of Marcos,* 103 F.3d 767, 776 (9th Cir.1996) (affirming district court's jury instruction al-

---

**12.** Presumably, the Eleventh Circuit meant that the federal court should give effect to the law forbidding violations, not that it should give effect to the violation.

lowing foreign leader to be held liable upon finding that he "directed, ordered, *conspired with*, or aided the military in torture, summary execution, and 'disappearance' "); *cf. Carmichael v. United Technologies Corp.*, 835 F.2d 109, 113 (5th Cir.1988) (assuming, but not deciding, that "the Alien Tort Statute does confer subject matter jurisdiction over private parties who conspire in, or aid in abet, official acts of torture by one nation against the citizens of another nation"). In *Doe v. Unocal Corp.*, 963 F.Supp. 880, 890–91 (C.D.Cal.1997), the court upheld jurisdiction under the ATCA where the plaintiff alleged that certain private defendants had conspired with state actors to violate the international human rights of the plaintiffs. The court relied primarily on federal constitutional precedents, which, while not dispositive, are at least persuasive in the absence of any other guidelines.

If Mr. Carballo had merely alleged that defendants made false accusations and thereby tricked the Bolivian officials into incarcerating him, the Court would harbor substantial doubts as to whether the ATCA could apply. His complaint, however, describes more than just a personal vendetta by purely private persons. He alleges that Susana Kavlin conspired with attorney Zegarra and Judge Nájera to detain him in miserable and life-threatening conditions until a settlement with Kodak could be extorted. The Court finds that this allegation of conspiracy suffices to meet whatever state action requirement the ATCA contains.

This brings us to the more difficult question: whether Carballo has sufficiently alleged that his eight or ten day confinement in the "Panóptico" prison violated the law of nations. Plaintiff points to several sources of international law in support of its claim that the law of nations forbids arbitrary detentions of individuals. Article 9.1 of the International Convention on Civil and Political Rights, Dec. 16, 1966, G.A. Res. 2200(A)(XXI), 6 I.L.M. 383, 999 U.N.T.S. 171 (1967) (to which both the United States and Bolivia are signatories), provides that "[e]veryone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention, No one shall be

deprived of his liberty except on such grounds and in accordance with such procedure as are established by law." Similarly, Article 7 of the American Convention on Human Rights, Nov. 22, 1969, 1144 U.N.T.S. 123, 9 I.L.M. 673 (1970) which Bolivia, but not the United States, has ratified, provides that "[n]o one shall be subject to arbitrary arrest or imprisonment," and that "[n]o one shall be deprived of his physical liberty except for reasons and under the conditions established beforehand by the constitution of the State Party concerned or by a law established pursuant thereto." Article 5.2 of the same Convention provides that "[a]ll persons deprived of their liberty shall be treated with respect for the inherent dignity of the human person."

International law clearly forbids arbitrary detentions. Nonetheless, defendants argue that merely because a particular provision of an international convention forbids a particular sort of conduct does not make that conduct a violation of the law of nations cognizable under the ATCA. They argue that some additional quality to the action is necessary. The Court concurs. Prohibiting "arbitrary detentions" is a fine idea; no reasonable person could gainsay it. But if one defines "arbitrary" as "contrary to the law of the land," then every instance of an arrest by the police which a court subsequently finds to have lacked probable cause (or its domestic equivalent) turns out to be an arbitrary detention cognizable under the ATCA. Suppose for a moment that the highest judicial court of Botswana determines that, under its own constitution, arrest for a crime may not proceed without probable cause amounting to a 40% likelihood that the arrestee committed the crime. The next day the police arrest and detain a suspect, but the presiding magistrate orders his release after finding that only a 39% probability that he is the culprit. Under international law, his arrest may be said to have been arbitrary, insofar as it was not permitted by the law of the land. Can the arrestee now bring a claim under the ATCA?

Surely not. Although international law recognizes "arbitrary detention" as a violation of human rights, the nations of the world

have reached no firm agreement on exactly what constitutes probable cause to arrest. The arbitrary detention standard sets a general and hortatory norm, not a "specific, universal and obligatory" one. *In re Estate of Ferdinand Marcos*, 25 F.3d at 1475 (9th Cir.1994). The arbitrary detention prohibition, without more, is no more helpful than the Universal Declaration of Human Rights' provision that "[n]o one shall be subjected to ... cruel, inhuman or degrading treatment or punishment." In *Forti v. Suarez–Mason (Forti II)*, 694 F.Supp. 707, 711–12 (N.D.Cal. 1988), the court refused to permit an ATCA suit to proceed under the Declaration's "inhuman or degrading treatment" provision, noting that the international community lacked any consensus as to what treatment is inhumane or degrading. Similarly, in *Guinto v. Marcos*, 654 F.Supp. 276, 279–80 (S.D.Cal. 1986), the court refused to allow an ATCA suit alleging a violation of the right to free speech. Although any number of international treaties and conventions protect the right to speak freely, even within our own country there remains significant disagreement about what exactly the freedom of speech entails. Thus, the mere fact that this Court might conclude that specific conduct amounted to "arbitrary detention" would not support the imposition of liability under the ATCA unless the international community would also agree that *that specific conduct* amounted to arbitrary detention. *Xuncax v. Gramajo*, 886 F.Supp. 162, 187 (D.Mass.1995) ("[T]he requirement of universality goes not only to recognition of the norm in the abstract sense, but to agreement upon its content as well."). Plaintiff's citation of international conventions provides a helpful starting point, but more detail is required.

Plaintiff cites a number of court and international tribunal decisions finding that specific acts of detention by the state violated international law. For example, in *Xuncax,* the court sustained a claim for arbitrary detention where various victims were detained and tortured for periods of time ranging from a few hours to a few days, in some cases ending in execution. 886 F.Supp. at 169–70. Of course, the torture and execution elements would be independently cognizable under the ATCA, *see Abebe–Jira*, 72 F.3d at 844, but the court did not make the viability of the arbitrary detention claims contingent upon the presence of the torture and execution claims. In *Paul v. Avril*, 901 F.Supp. 330 (S.D.Fla.1994), the court awarded damages under the ATCA for torture and false imprisonment committed on various Haitian citizens by the nation's former military ruler. In *Forti v. Suarez–Mason (Forti I)*, 672 F.Supp. 1531, 1541 (N.D.Cal.1987), the Court permitted the claim that the defendant "arbitrarily and without justification, cause or privilege, forcibly confined [the plaintiffs] for a prolonged period." The Court noted that "[t]here is case law finding sufficient consensus to evince a customary international norm against arbitrary detention," *id.* (citing cases), and further noted that "[t]he consensus is even clearer in the case of a state's *prolonged* arbitrary detention of its own citizens." *Id.* (emphasis in original). In *Forti I,* the defendant arbitrarily imprisoned the plaintiff for more than four years.

Defendants respond that while some of these cases do permit a cause of action for arbitrary detention under the ATCA, the key ingredient (in addition to "arbitrary") is "prolonged." According to defendants, a requirement that the arbitrary detention have been prolonged would provide the additional quality to arbitrary detention claims that would prevent just any violation of due process from becoming an ATCA tort. They note that the Restatement of Foreign Relations' discussion of the arbitrary detention prohibition of international includes a "prolonged" proviso. *Restatement (Third) of Foreign Relations Law of the United States* § 702 comment h ("[A]rbitrary detention violates customary law if it is prolonged and practiced as state policy."). Additionally, they note that in the cases cited by plaintiff, not only was the detention prolonged, but it was aggravated by torture or other inhumane acts.

As to the aggravation point, Carballo's experience in the "Panóptico" prison probably did not amount to torture within the meaning of international law. The Court, however, rejects the unsupported proposition that arbitrary detention only becomes cognizable under the ATCA when accompanied by torture. Furthermore, even assuming that

some level of aggravation is required to distinguish cognizable arbitrary detentions from run-of-the-mill due process violations, plaintiff has alleged that his stay in the prison was horrendous by any contemporary standard of human decency. Of course, Ms. Kavlin did not herself inflict the aggravation, but assuming that she knew about the prison's conditions and conspired to cause Mr. Carballo to undergo that dreadful experience, under ordinary principles of tort law she would be liable for the foreseeable effects of her actions. If aggravation is required, plaintiff has pleaded it sufficiently.

The "prolonged" issue gives the Court some pause. Some courts referring to the tort of arbitrary detention have included the adjective "prolonged," while others have omitted it. *See Hilao,* 103 F.3d at 794 (including "prolonged"); *Alvarez–Machain v. United States,* 96 F.3d 1246, 1249 (9th Cir.) (including "prolonged"), *amended and superseded,* 107 F.3d 696 (9th Cir.1996); *Kadic,* 70 F.3d at 242 (omitting "prolonged"); *In re Estate of Marcos, Human Rights Litigation,* 910 F.Supp. 1460, 1462 (D.Hawai'i 1995) (omitting "prolonged"), *aff'd sub nom., Hilao v. Estate of Marcos,* 103 F.3d 767 (9th Cir. 1996); *Abebe–Jiri v. Negewo,* 1993 WL 814304 * 4 (N.D.Ga.1993) (omitting "prolonged"), *aff'd,* 72 F.3d 844 (11th Cir.1996). It makes little sense, however, to place much reliance on the inclusion or omission of an adjective when the adjective's importance is not at issue in a particular case. The bottom line remains that plaintiff has cited no case in which an eight or ten day detention, without accompanying torture or other violation of human law, has been held to be actionable under the ATCA, and defendants have cited no cases in which the length of detention has been held dispositive to the viability of an ATCA claim.

Fortunately, the Court need not decide in the abstract whether "prolonged" is an element required in an arbitrary detention claim. Even assuming that it is, the Court sees no reason why a prison stay of eight or ten days cannot be considered a "prolonged" detention. Defendants implicitly assume that whatever "prolonged" means, it must mean more than eight or ten days. But

why? What does it mean for a detention to be prolonged? If the standard were purely comparative, then Nelson Mandella's twenty-seven year imprisonment for political reasons might set a very high threshold of duration for the actionability of "arbitrary detention" claims. Under such a standard, even the *Forti* plaintiff's four years in detention might not look particularly "prolonged." But that cannot be right. The actionability of one plaintiff's claims cannot depend on the degree of evil perpetrated on another plaintiff. If "prolonged" is an element of an arbitrary detention claim, it must be in a more standardized sense.

In the present case, Mr. Carballo's detention was substantial. If his allegations are accurate, this was not a standard pre-trial incarceration, but a calculated, extortionate imprisonment motivated solely by a desire for economic gain and designed to last until Kodak capitulated to Casa Kavlin's terms. According to plaintiffs, Carballo got out as early as he did only because Kodak, knowing its employee to be in a life-threatening predicament, signed the necessary settlement papers with Casa Kavlin. Assuming again that Carballo tells the true story, it would be preposterous to imagine that the success or failure of his tort claim should depend upon how long Kodak waited before capitulating to Casa Kavlin's extortionate demands.

■■■■ With deep reservations, the Court holds that Carballo has stated a claim under the ATCA. As egregious as Casa Kavlin's conduct may be if plaintiff's allegations stand true, it pales in comparison to the usual fare under the ATCA—hideous torture, gang rape, genocidal murder, and the like. Nonetheless, the Court finds that the law of nations does prohibit the state to use its coercive power to detain an individual in inhumane conditions for a substantial period of time solely for the purpose of extorting from him a favorable economic settlement. The Court also finds that the Alien Tort Claims Act makes responsible anyone who conspires with state actors to achieve such an unlawful arbitrary detention. Accordingly, defendants' motion will be denied on this ground.

## CONCLUSION

For the foregoing reasons, the Court finds that it must entertain Count I of Kodak's complaint and Carballo's Alien Tort claims. The Court continues to harbor deep reservations about the suitability of this court as a forum to adjudicate issues arising under Bolivian law, with which the Court has no expertise, and the "law of nations," which Congress has failed to define. Nonetheless, as Chief Justice John Marshall observed in *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821), "[t]he judiciary cannot, as the legislature may, avoid a measure .... We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *See also Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, —— – ——, 116 S.Ct. 1712, 1720–21, 135 L.Ed.2d 1 (1996) (Federal courts have a strict duty to exercise the jurisdiction that Congress confers on them and may only avoid such exercise in exceptional circumstances.). Congress has conferred the jurisdiction in question, and the Court must exercise it.

The Court has considered defendants' motions, and the pertinent portions of the record, and being otherwise fully advised in the premises, it is

ORDERED AND ADJUDGED that

1. Defendants' motions to dismiss **[DE 18 in 96–2218; DE 21 in 96–2219]** be, and the same are hereby **GRANTED IN PART, DENIED IN PART, and DEFERRED IN PART.** The Motion is **GRANTED** insofar as Counts II, III, and IV of Kodak's complaint are dismissed. The Motion is **DEFERRED** insofar as the Court will reserve on the issue of personal jurisdiction pending an evidentiary hearing. The motion is otherwise **DENIED.**

2. Plaintiffs' Motion for Leave to File Memoranda in Excess of Page Limitations **[DE 78]** be, and the same is hereby **GRANTED;**

3. Defendants' Motion for Leave to File Three Separate Responses **[DE 91]** be, and the same is hereby **GRANTED;**

4. Defendants' Motion for Leave to File Reply Memoranda in Excess of Ten Pages **[DE 103]** be, and the same is hereby **GRANTED.**