United States Court of Appeals,
Eleventh Circuit.

No. 93-9133.

Hirute ABEBE-JIRA; Edgegayehu Taye; Elizabeth Demissie, Plaintiffs-Appellees,

v.

Kelbessa NEGEWO a/k/a Kelbessa Negaw, a/k/a Kellbessa, Defendant-Appellant.

Jan. 10, 1996.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:90-02010-CV-GET), G. Ernest Tidwell, Judge.

Before HATCHETT and COX, Circuit Judges, and JOHNSON, Senior Circuit Judge.

HATCHETT, Circuit Judge:

Appellant, Kelbessa Negewo, appeals a judgment of the District Court for the Northern District of Georgia awarding compensatory and punitive damages to appellees, Hirute Abebe-Jira, EdgeGayehu Taye, and Elizabeth Demissie, for torture and cruel, inhuman, and degrading treatment, pursuant to the Alien Tort Claims Act, 28 U.S.C. § 1350. We affirm.

**FACTS**

In the mid-1970s, a military dictatorship, known as "the Dergue," ruled Ethiopia and employed a campaign of torture, arbitrary imprisonment, and summary executions against perceived enemies of the government. Leaders of local governing units carried out the terror campaign, called "the Red Terror," at the local level. The dictatorship divided Ethiopia's capital, Addis Ababa, into twenty-five governing units called Higher Zones. During the relevant period, Negewo served as chairman of Higher

Zone 9.

In December 1977, guards from Higher Zone 9 arrested Abebe-Jira and took her to a prison where she met Negewo. She remained imprisoned for two weeks without any charges being filed against her. In January 1978, Higher Zone 9 guards arrested Abebe-Jira and her sixteen-year-old sister and took them to the prison where Abebe-Jira had been previously detained. Negewo and other men tortured and interrogated Abebe-Jira for several hours. They ordered her to undress, bound her arms and legs, and whipped her on her legs and back with a wire. Abebe-Jira's torturers also repeatedly threatened her with death. The district court found that Negewo personally supervised at least some of the interrogation and torture of Abebe-Jira and also personally interrogated and participated directly in some of the acts of torture. Following her interrogation and torture, Abebe-Jira remained imprisoned for three months.

Higher Zone 9 guards arrested Taye in February 1978. Shortly after her arrest, Negewo and guards interrogated and tortured her for a period of several hours. Negewo and several guards instructed Taye to remove her clothes, bound her arms and legs together, hung her from a pole, and severely beat her. They then poured water onto her wounds to increase her pain. Taye received no medical care for the wounds and, as a result of the torture, bears permanent physical scars. Taye remained incarcerated for a period of ten months, and during that time she endured frequent interrogations and several incidents of torture. The district court found that Negewo personally supervised and participated in

some of the interrogation and torture of Taye.

In April 1977, Negewo and several guards arrested Demissie, a seventeen-year-old student, three of her sisters, and her father. Demissie and her family remained imprisoned for two weeks without charges.  In October 1977, Higher Zone 9 guards again arrested Demissie and her fifteen-year-old sister, Haimanot.  After being detained at two different prisons, guards took Demissie and her sister to the jail in Higher Zone 9 that Negewo controlled, where guards interrogated and tortured them.  The guards ordered Demissie to undress, bound her arms and feet, placed a wooden pole under her legs, and lifted her into the air;  then, they beat her severely. After torturing her, the guards returned Demissie to her cell with her sister.  Several days later, guards took Demissie's sister from the cell.  Demissie and her family have not heard from nor seen Haimanot since that day.  Demissie remained in custody until June 1978.  The district court found that Negewo personally supervised some of the interrogation and torture of Demissie.

Following their release, the appellees fled Ethiopia and sought exile in the United States and Canada.  In 1989, Taye encountered Negewo in an Atlanta, Georgia, hotel where they both worked.

PROCEDURAL HISTORY

In September 1990, the appellees filed this lawsuit against Negewo charging him with responsibility for their torture and other cruel acts in violation of the Alien Tort Claims Act, 28 U.S.C. § 1350.  Prior to trial, Negewo made three requests for the appointment of counsel.  The district court denied the first two

requests on the ground that Negewo had not made a showing sufficient to authorize or justify the appointment. The district court apparently did not enter a written order on Negewo's third request. Following a two-day bench trial, the court found Negewo liable for the torture and cruel, inhuman, and degrading treatment of the appellees and awarded each appellee $200,000 in compensatory damages and $300,000 in punitive damages. Negewo appeals.

CONTENTIONS

Negewo argues that the district court lacked subject matter jurisdiction because the Alien Tort Claims Act neither provides a private right of action, nor incorporates a right of action through reference to a treaty or federal law. He also contends that this suit is barred because it involves a nonjusticiable political question.[*]

The appellees contend that a literal reading of the Alien Tort Claims Act demonstrates that the district court had subject matter jurisdiction. They also contend that the political question doctrine does not bar this action.

DISCUSSION

*Subject Matter Jurisdiction Under the Alien Tort Claims Act*

---

[*]Negewo presses two other claims that we reject in summary fashion. First, Negewo asserts that the applicable statute of limitations, which he contends is Georgia's two-year limitation for tort actions, bars this lawsuit. Negewo, however, did not raise this claim below; accordingly, we will not consider it on appeal. Second, Negewo argues that the district court erred in failing to grant his requests for appointment of counsel. In a civil case, appointment of counsel "is justified only by exceptional circumstances." *Fowler v. Jones,* 899 F.2d 1088, 1096 (11th Cir.1990). Because Negewo has not demonstrated exceptional circumstances, we hold that the district court did not abuse its discretion in denying his requests for counsel.

The subject matter jurisdiction of the district court is a question of law we review *de novo.* *United States v. Perez,* 956 F.2d 1098, 1101 (11th Cir.1992).

The Alien Tort Claims Act provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C.A. § 1350 (West 1993). The leading case interpreting the Alien Tort Claims Act was decided by the Second Circuit Court of Appeals in *Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir.1980). In 1979, Dolly Filartiga, who had immigrated to the United States, learned that Americo Norberto Pena-Irala, a former Paraguayan police official, was residing in Brooklyn, New York. Thereafter, Filartiga and her father, Dr. Joel Filartiga, filed a wrongful death action in federal district court under section 1350, alleging that in 1976 Pena-Irala kidnapped and tortured to death Joelito Filartiga, Dr. Filartiga's seventeen-year-old son. The district court dismissed the Filartigas' complaint for lack of subject matter jurisdiction. The court of appeals reversed, however, recognizing the emergence of a universal consensus that international law affords substantive rights to individuals and places limits on a state's treatment of its citizens. *Filartiga,* 630 F.2d at 880-87. The court of appeals emphasized that federal courts considering whether to assume jurisdiction under section 1350 should interpret international law as it has evolved and exists at the time of the case. *Filartiga,* 630 F.2d at 881. The court then concluded that official torture is now prohibited by the law of nations. *Filartiga,* 630 F.2d at 884.

The *Filartiga* court was not squarely presented with the question of whether the Alien Tort Claims Act provided a private right of action. The Second Circuit, however, in dicta, "construe[d] the Alien Tort Statute, not as granting new rights to aliens, but simply as opening the federal courts for adjudication of the rights already recognized by international law." *Filartiga,* 630 F.2d at 887. Since *Filartiga,* a majority of courts have interpreted section 1350 as providing both a private cause of action and a federal forum where aliens may seek redress for violations of international law. *See, e.g., Kadic v. Karadzic,* 70 F.3d 232, 236 (2d Cir.1995) ("[The] Act appears to provide a remedy for the appellants' allegations of violations related to genocide, war crimes, and official torture...."); *Hilao v. Estate of Marcos* (*In re Estate of Ferdinand Marcos, Human Rights Litigation* ), 25 F.3d 1467, 1474-75 (9th Cir.1994) ("*Marcos* ") (rejecting the assertion that section 1350 is a jurisdictional provision that does not grant a cause of action and concluding that the section "creates a cause of action for violations of specific, universal and obligatory international human rights standards"), *cert. denied,* --- U.S. ----, 115 S.Ct. 934, 130 L.Ed.2d 879 (1995); *Xuncax v. Gramajo,* 886 F.Supp. 162, 179 (D.Mass.1995) ("§ 1350 yields both a jurisdictional grant and a private right to sue for tortious violations of international law ... without recourse to other law as a source of the cause of action."); *Paul v. Avril,* 812 F.Supp. 207, 212 (S.D.Fla.1993) ("The plain language of the statute and the use of the words "committed in violation' strongly implies that a well pled tort[,] if committed in violation of the

law of nations, would be sufficient [to give rise to a cause of action].");  *Forti v. Suarez-Mason,* 672 F.Supp. 1531, 1539 (N.D.Cal.1987) (same), *on reconsideration on other grounds,* 694 F.Supp. 707 (N.D.Cal.1988).  *But see Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 798 (D.C.Cir.1984) (Bork, J., concurring) (concluding that neither federal common law, federal statute, nor international law affords an alien plaintiff a cause of action), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985).

We reject Negewo's assertion that the district court lacked subject matter jurisdiction because the Alien Tort Claims Act does not provide a private right of action.  On its face, section 1350 requires the district courts to hear claims "by an alien *for a tort* only, *committed in violation of the law of nations.*"  28 U.S.C.A. § 1350 (West 1993) (emphasis added).  We read the statute as requiring no more than an allegation of a violation of the law of nations in order to invoke section 1350.  *See, e.g., Kadic,* 70 F.3d at ---- ("[The] statute confers federal subject-matter jurisdiction when the following three conditions are satisfied:  (1) an alien sues (2) for a tort (3) committed in violation of the law of nations (*i.e.,* international law).");  *Marcos,* 25 F.3d at 1475 (" "[N]othing more than a *violation* of the law of nations is required to invoke section 1350.' ") (quoting *Tel-Oren,* 726 F.2d at 779 (Edwards, J., concurring));  *Xuncax,* 886 F.Supp. at 180 ("All that the statute requires is that an alien plaintiff allege that a "tort' was committed "in violation' of international law or treaty of the United States.").  Moreover, the "committed in violation" language of the statute suggests that Congress did not intend to

require an alien plaintiff to invoke a separate enabling statute as a precondition to relief under the Alien Tort Claims Act. *See, e.g., Handel v. Artukovic,* 601 F.Supp. 1421, 1427 (C.D.Cal.1985) ("[T]he "violation' language of section 1350 may be interpreted as explicitly granting a cause of action...."); *Paul,* 812 F.Supp. at 212 (same); *Forti,* 672 F.Supp. at 1539 (same). Lastly, we find support for our holding in the recently enacted Torture Victim Protection Act of 1991 (TVPA), Pub.L. No. 102-256, 106 Stat. 73. In enacting the TVPA, Congress endorsed the *Filartiga* line of cases:

> The TVPA would establish an unambiguous and modern basis for a cause of action *that has been successfully maintained under an existing law,* section 1350 of the Judiciary Act of 1789 (the Alien Tort Claims Act), *which permits Federal district courts to hear claims by aliens for torts committed "in violation of the law of nations."*

H.R.Rep. No. 367, 102d Cong., 2d Sess. 3, *reprinted in* 1992 U.S.C.C.A.N. 84, 86 (emphasis added). Congress, therefore, has recognized that the Alien Tort Claims Act confers both a forum and a private right of action to aliens alleging a violation of international law.

Accordingly, we conclude that the Alien Tort Claims Act establishes a federal forum where courts may fashion domestic common law remedies to give effect to violations of customary international law. *See, e.g., Kadic,* 70 F.3d at 236; *Filartiga,* 630 F.2d at 887; *Xuncax,* 886 F.Supp. at 179-83. Congress, of course, may enact a statute that confers on the federal courts jurisdiction over a particular class of cases while delegating to the courts the task of fashioning remedies that give effect to the federal policies underlying the statute. *See, e.g., Textile*

*Workers of America v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

*Applicability of the Political Question Doctrine*

Negewo also contends that this case should have been dismissed because it presents a nonjusticiable political question. The political question doctrine prevents the judicial branch from deciding issues textually committed to the legislative or executive branches. *Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962). However, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker,* 369 U.S. at 211, 82 S.Ct. at 706. In *Linder v. Portocarrero,* 963 F.2d 332, 337 (11th Cir.1992), we held that the political question doctrine did not bar a tort action instituted against Nicaraguan contra leaders. Consequently, we reject Negewo's contention in light of *Linder.*

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.