**Zita CABELLO BARRUETO, in her capacity as personal representative of the Estate of Winston Cabello, and in her individual capacity, Elsa Cabello, Karen Cabello Moriarty, and Aldo Cabello, Plaintiffs,**

v.

**Armando FERNÁNDEZ LARIOS, Defendant.**

No. 99–0528–CIV.

United States District Court, S.D. Florida.

June 5, 2002.

Julie Ferguson, Bander, Fox–Isicoff & Assoc., Miami, FL, Robert G. Kerrigan, Kerrigan Estess Rankin & McLeod, Pensacola, FL, Joshua Sondheimer, Center for Justice & Accountability, San Francisco, CA, Nicole M. Healy, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, Susan Shawn Roberts, San Francisco, CA, Paul L. Hoffman, Schonbrun DeSimone Seplow & Hoffman, Venice, CA, for plaintiffs.

Stephen W. Davis, Boies Schiller & Flexner, Miami, FL, Timothy J. Norris, Buchanan Ingersoll, P.C., Miami, FL, Parker D. Thomson, Hogan & Hartson, Miami, FL, for defendant.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

LENARD, District Judge.

**THIS CAUSE** is before the Court on the Motion to Dismiss Second Amended Complaint (D.E.136), filed November 2, 2001 by Defendant Armando Fernández Larios. On December 12, 2001, Plaintiffs Elsa Cabello, Karin Cabello Moriarty, Aldo Cabello, and Zita Cabello Barrueto filed a Response. On January 5, 2002, Defendant filed a Reply Having reviewed the Motion, the Response, the Reply, and the record, the Court finds as follows.

### I. Factual Background

The following factual allegations derive from Plaintiffs' Second Amended Complaint, filed September 17, 2001. This dispute arises out of the events surrounding the alleged execution of Winston Cabello ("Cabello" or "decedent") on October 17, 1973. Prior to September, 1973, Cabello worked as an economist appointed by the government of President Salvador Allende to serve as Director of the Regional Planning Office for the Atacarna–Coquimbo region in Copiapó, Chile. (2nd Am. Compl.¶ 24.) On September 11, 1973, President Allende was ousted in a coup d'etat led by Chilean military officers, whereby General Agosto Pinochet seized control and began ruling Chile as a military junta. (¶ 26.) One day after the coup, Cabello was arrested and incarcerated in the Copiapó jail. (¶ 27.) Within a few weeks, he was transferred to the Copiapó military garrison. (¶ 28.)

Following the coup d'etat, in October, 1973, a squad of military officers headed by Chilean Army General Sergio Arellano Stark embarked upon what became known as the "Caravan of Death." (¶ 2.) The squad traveled to a number of cities in northern Chile, where military officers engaged in acts of extrajudicious killing, torture, and abuse of various individuals who were incarcerated due to their perceived or actual opposition to the military junta. (¶ 30.) Defendant Armando Fernández Larios accompanied the Caravan of Death to northern Chilean cities, including Copiapó, and served as body guard to General Arellano. (¶ 34.) Defendant "was aware of the deaths of the prisoners at or near the time of the Caravan's visit to each of the cities" and "engaged in acts including acts of violence designed to injure, harm, tor-

ture, and result in the deaths of the prisoners." (*Id.*) While a member of the Caravan, Defendant was armed with various weapons, including a *corvo,* a "short, curved knife ... designed to inflict wounds that, although ultimately fatal, cause a slow and painful death." (¶ 35.)

On October 16, 1973, Defendant and five other members of General Arellano's squad arrived at the Copiapó military garrison. (¶ 36.) They instructed local military officers to provide them with the prisoners' files, and then selected thirteen prisoners, including Cabello, for execution. (¶ 37.) All thirteen prisoners were professionals or community leaders, selected for execution as part of the squad's scheme to eliminate opposition to the Pinochet regime. (¶ 38.) During the night, Cabello and other prisoners were loaded onto a military truck, driven about ten minutes outside of Copiapó, and ordered to get off the truck. (¶ 42.) When Cabello refused to get off the truck, he was slashed with a *corvo.* (¶ 43.) The bodies of Cabello and the other prisoners were guarded at a military facility until they were removed to the Copiapó cemetery. (¶ 44.)

On October 18, 1973, the local Copiapó newspaper published an announcement falsely indicating that thirteen political prisoners had been killed "while trying to escape" during their transfer from detention in Copiapó to another prison. (¶ 45.) Shortly after Cabello's death in 1973, his family received a death certificate indicating that he was executed by the Chilean military. (¶ 46.) In 1985, the decedent's family received a revised death certificate identifying the cause of death as a gunshot wound. (*Id.*) Once the civilian government under the leadership of President Patricio Aylwin replaced General Pinochet's military regime in 1990, the Chilean government granted requests to exhume the bodies of Cabello and the other twelve political prisoners killed on October 17, 1973. (¶ 49.)

The exhumation revealed that many of the victims were slashed with *corvos,* but did not indicate whether the victims had been killed during an escape attempt. (¶ 50.) In 1991, the family received a final death certificate lacking reference to the cause of death. (¶ 49.)

Between 1973 and 1990, Chilean military authorities deliberately concealed the decedent's burial location from his family. (¶ 47.) The Chilean military government in 1978 also gave amnesty to the perpetrators and accomplices of criminal acts committed between September 11, 1973 and March 10, 1978. (¶ 56.) On August 24, 1990, the Chilean Supreme Court extended that decree of amnesty to human rights violations committed by the military during the foregoing period. (*Id.*) Plaintiffs thus allege that they are without adequate remedies in Chile. (*Id.*)

Defendant resigned from the Chilean military in or about January, 1987, by which time had risen to the rank of major. (¶ 14.) At the time of his resignation, he admitted publicly that he had been a member of General Arellano's squad in October, 1973. (*Id.*) Defendant secretly entered the United States in or about January, 1987 and lived in an undisclosed location under the protection of the U.S. Government. (¶ 15.) On or about February 4, 1987, he pled guilty to being an "accessory after the fact" to the 1976 [Directorate of National Intelligence]-sponsored car bombing in Washington, D.C. that killed the ex-Chilean Ambassador to the United States, Orlando Letelier, and his assistant, Ronni Karpen Moffit. (¶ 16.) Currently, Defendant resides in Miami, Florida. (*Id.* ¶ 10.)

## II. Procedural History

### A. Proceedings Related to Amended Complaint

The following Plaintiffs filed the original Complaint in this action on February 19,

1999: the Estate of Winston Cabello; Elsa Cabello, mother of Winston Cabello, a naturalized U.S. citizen who resides in California; Zita Cabello Barrueto, sister of Winston Cabello, a naturalized U.S. citizen who resides in California, in her individual capacity and in her capacity as the personal representative for the Estate of Winston Cabello; Karin Cabello Moriarty, sister of Winston Cabello, a naturalized U.S. citizen who resides in California; and Aldo Cabello, brother of Winston Cabello, a Chilean citizen who is a legal permanent resident of the United States, residing in California.

Plaintiffs filed a seven-claim Amended Complaint on April 7, 1999, alleging causes of action for: extrajudicial killing; torture; crimes against humanity; cruel, inhuman or degrading treatment or punishment; wrongful death; intentional infliction of emotional distress; and civil conspiracy. On April 24, 2000, the Court dismissed the wrongful death and civil conspiracy claims based on Plaintiffs' notice of voluntary dismissal.

Defendant filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction (D.E.22) and a Motion for Summary Judgment, or, in the Alternative, a Rule 12(b)(6) Motion to Dismiss (D.E.19) on May 24, 1999. On August 10, 2001, the Court granted in part and denied in part the Motion to Dismiss for Lack of Subject Matter Jurisdiction, and denied the Motion for Summary Judgment and Rule 12(b)(6) Motion to Dismiss. (D.E.120.) The Court denied the Motion for Summary Judgment without prejudice to afford Plaintiffs adequate time for discovery. The Court dismissed all claims by the Estate of Winston Cabello ("the Estate") for lack of standing, and dismissed the intentional infliction of

emotional distress claim as time barred under Chilean law. The torture claim was dismissed for lack of standing because it was asserted by the Estate alone. As a result of the Court's August 10th Order, only three claims remained: extrajudicial killing, crimes against humanity, and cruel, inhuman or degrading punishment or treatment. The Court directed Plaintiffs to file a Second Amended Complaint by August 27, 2001.[1] On August 21, 2001 the Court granted Defendant's Motion to Strike, in part, striking Plaintiffs' prayer for attorney's fees. (D.E.122.)

**B. Second Amended Complaint**

The Second Amended Complaint contains certain amended factual allegations.[2] Plaintiffs now assert eight claims for relief:

Claim I—Extrajudicial Killing, brought by Plaintiffs Elsa Cabello, Karin Cabello Moriarty, and Zita Cabello Baruetto, in her individual capacity, under the Torture Victim Protection Act ("TVPA"), Pub.L. 102–256, Mar. 12, 1992, 106 Stat. 73 (codified at 28 U.S.C. § 1350 note).

Claim II—Extrajudicial Killing, in violation of customary international law, Article 6 of the International Covenant on Civil and Political Rights ("ICCPR") and the TVPA, by Zita Cabello Baruetto, in her capacity as personal representative of the Estate, under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350.

Claim III—Extrajudicial Killing, in violation of customary international law, Article 6 of the International Covenant on Civil and Political Rights ("ICCPR") and the TVPA, by Adlo Cabello, under the ATCA;

Claim IV—Torture, in violation of customary international law, Article 7 of the

---

1. Plaintiffs conceded that Chilean law applied to all non-federal claims in the Amended Complaint.

2. Of particular relevance, Plaintiffs no longer allege that Defendant personally killed their decedent with a *corvo,* nor that he was in the Witness Protection Program from 1987 until recently.

ICCPR, the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the "Torture Convention"), and the TVPA, by Zita Cabello Baruetto, in her capacity as personal representative of the Estate, under the ATCA;

Claim V—Crimes Against Humanity, in violation of customary international law, by Zita Cabello Baruetto, in her capacity as personal representative of the Estate, under the ATCA;

Claim VI—Crimes Against Humanity, in violation of customary international law, by Aldo Cabello, under the ATCA;

Claim VII—Cruel, Inhuman or Degrading Treatment or Punishment, in violation of customary international law, by Zita Cabello Baruetto, in her capacity as personal representative of the Estate, under the ATCA; and

Claim VIII—Cruel, Inhuman or Degrading Treatment or Punishment, in violation of customary international law, by Aldo Cabello, under the ATCA.

### III. Parties' Arguments

Defendant asserts that the Second Amended Complaint fails to state a claim upon which relief may be granted because Plaintiffs have changed a number of key factual allegations from the Amended Complaint. First, Defendant contends that he cannot be held liable for acts taken pursuant to orders of his military superiors. As Plaintiffs no longer allege that Defendant personally killed their decedent, he argues that he cannot be held liable in tort for "indirect participation" in the murder. Second, Defendant maintains that Plaintiffs' claims are time barred, and not subject to equitable tolling, because Plaintiffs now concede that Defendant has been amenable to service of process in the United States since 1987. Third, Defendant argues that Zita Cabello Barrueto, as personal representative of the Estate, lacks standing to assert claims for torture, crimes against humanity, or cruel, inhuman or degrading treatment, because Chilean law does not recognize her as a beneficiary of the estate.

Plaintiffs argue, first, that an individual who indirectly participates in human rights violations may be held liable under international law. Second, Plaintiffs assert that their claims are not time barred, for the reasons previously stated by this Court. Third, Plaintiffs contend that the standing issue is controlled by federal or Florida law, rather than Chilean law, and, as such, the legal representative of the estate has standing to bring the claims asserted in the Second Amended Complaint.

### IV. Motion to Dismiss Standard of Review

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move for dismissal of a claim that fails to state a claim upon which relief can be granted. The Eleventh Circuit has clearly articulated the standard of review for a Rule 12(b)(6) motion to dismiss:

"The standard of review for a motion to dismiss is the same for the appellate court as it is for the trial court." *Stephens v. Dep't of Health & Human Servs.*, 901 F.2d 1571, 1573 (11th Cir. 1990). A motion to dismiss is only granted when the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

*Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir.), *cert. denied*, 525 U.S. 1000, 119 S.Ct. 509, 142 L.Ed.2d 422 (1998). "On a motion to dismiss, the facts stated in appellant's complaint and all reasonable inferences therefrom are taken as true." *Stephens*, 901 F.2d at

1573. Accordingly, the Court accepts the facts stated in Plaintiffs' Second Amended Complaint and all reasonable inferences therefrom as true.

## V. Analysis

### A. Equitable Tolling

In the August 10, 2001 Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, the Court found that the TVPA's ten-year statute of limitations should be equitably tolled due to, *inter alia*, the Chilean military's deliberate concealment of the decedent's burial location from Plaintiffs, who were unable to view the decedent's body until 1990, and the confusion caused by the issuance of three different death certificates between 1973 and 1991. The Court explicitly found that, "once the civilian government under the leadership of President Patricio Aylwin replaced General Pinochet's military regime in 1990, the tolling ceased, and the limitations period commenced." (D.E. 20 at 40.) "In addition, the Court finds that Defendant's status in the Witness Protection Program since February 4, 1987 until a time shortly before the Complaint was filed, created a period in which Defendant was ostensibly absent from this jurisdiction, in that he could not be served." (*Id.*)

Defendant argues that since the Second Amended Complaint no longer alleges that Defendant was in the Witness Protection Program, and thereby concedes that Defendant was amenable to service of process in the United States since 1987, principles of equitable tolling should not apply. Defendant's argument, however, contravenes the Court's clear holding that the tolling ceased, and the ten-year limitations period commenced, in 1990. The Court's finding with respect to Defendant's participation in the Witness Protection Program was not crucial to the Court's determination; rather, it merely provided further support for application of the equitable tolling principle.

None of the authorities cited by Defendant compels a different conclusion.[3] In particular, Defendant relies on a non-binding Seventh Circuit case, *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990), to argue that equitable tolling applies only for a short period of time after a plaintiff has obtained, or by due diligence could have obtained, the information necessary to file the lawsuit. (Def.'s Reply at 5.) In *Cada*, however, Judge Posner distinguished between a situation where a plaintiff, through no fault of a defendant, has been unable to obtain information necessary to decide whether his injury is due to the defendant's wrongdoing, and one where a defendant takes active steps to prevent the plaintiff from suing in time.[4]

---

**3.** Defendants suggest that the Court should reconsider its ruling on the equitable tolling issue in light of *TRW Inc. v. Andrews*, 534 U.S. 19, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001), where the Supreme Court declined to apply a general discovery rule in the context of the Fair Credit Reporting Act, 15 U.S.C. § 1681p. The Court finds that *TRW Inc.* is inapposite to the instant case because the Supreme Court specifically addressed the language and structure of the FCRA provision, which explicitly delineates a two-year limitation period triggered by the date of discovery in cases where a defendant willfully misrepresents material information. *Id.* at 447–48. The Supreme Court did not purport to alter the general principles of equitable tolling, nor did it direct lower courts to apply them differently.

**4.** Judge Posner calls the former situation "equitable tolling" and the latter "equitable estoppel." *Id.* at 450–51. The terms are often used interchangeably. *See Browning v. AT & T Paradyne*, 120 F.3d 222, 226 (11th Cir.1997) ("AT & T appears to be confusing, as apparently do many litigants and courts, the doctrines of equitable tolling and equitable estoppel"). For instance, the House Report on the TVPA speaks in terms of "equitable tolling remedies" to remedy situations of fraudulent concealment. H.R. REP. NO. 102–367(I), 1992 U.S.C.C.A.N. 84,88. Without getting en-

*Id.* at 450–53. In the former context, the limitation period is tolled only during the period in which the plaintiff could not obtain the information; in the latter case, the defendant's act of concealment postpones the accrual of the limitation period altogether. *Id.*

■ The instant case fits within the latter category, as the Court determined in the previous Order that the pre–1990 Chilean government's concealment of the decedent's burial location and the accurate cause of death prevented Plaintiffs from bringing this action until 1990. Accordingly, the ten-year limitation period did not begin to accrue until 1990. Since Plaintiffs brought this action within ten years, and Defendant has not presented the Court with any compelling reason to alter its previous ruling that the limitation period commenced in 1990, the Court finds that the claims alleged in the Second Amended Complaint are not time barred.

## B. Liability for Indirect Participation in Human Rights Abuses

In the Second Amended Complaint, Plaintiffs allege claims of extrajudicial killing, torture, crimes against humanity, and cruel, inhuman, or degrading treatment or punishment. The Court ruled previously that each of these causes of action, with the exception of torture,[5] is actionable in federal court under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350.[6] Defendant argues that Plaintiffs fail to state a claim because the Second Amended Complaint alleges only indirect participation by Defendant in the murder of the decedent.[7] (Def.'s Reply at 6–8.)

The Second Amended Complaint alleges that Defendant "actively participated" in the extrajudicial killing, torture, infliction of severe pain and suffering, and acts of cruel, inhuman and degrading treatment with respect to the decedent. (2nd Am. Compl.¶¶ 58, 65, 81, 92, 99, 106, 114.) Additionally, each claim for relief alleges that Defendant participated as a "joint tortfeasor, co-conspirator, and participant in a common plan, design and scheme," and that he "procured, counseled, aided, abetted and assisted the other members of General Arellano's squad in effecting the common plan, design, and scheme" that resulted in decedent's death, pain and suffering, torture, and other inhumane acts. (*Id.*) Specifically, Plaintiffs allege that Defendant served as bodyguard to General Arellano, that he "engaged in acts of violence designed to injure, harm, torture, and result in the death of the prisoners,"

tangled in a debate over semantics, the Court addresses the material issue of whether the TVPA's ten-year limitation period bars the instant action.

5. The Court dismissed the torture claim alleged in Count II of the Amended Complaint on grounds that the Estate of Winston Cabello lacked the legal capacity to sue Defendant. In the Second Amended Complaint, Plaintiff Zita Cabello Barrueto, in her capacity as the personal representative of the Estate of Winston Cabello, brings a claim for torture against Defendant. Official torture clearly violates obligatory norms of customary international law, and is therefore actionable under the ATCA. *See Kadic v. Karadzic,* 70 F.3d 232, 236 (2d Cir.1995), *cited in Abebe–Jira v. Negewo,* 72 F.3d 844, 847 (11th Cir.1996). The

Court addresses the issue of whether the legal representative has standing to bring a torture claim in Section V–C, *infra.*

6. The ATCA provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

7. Defendant argues that there is no concept of civil conspiracy under Chilean tort law. Where all of the claims in the Second Amended Complaint are brought under international law, however, the relevant question is whether Plaintiffs have alleged conduct by Defendant that violates the "law of nations," including international agreements and customary international law.

and that he "was aware of the deaths of the prisoners." (*Id.* ¶ 34.)

As the Court construes the Second Amended Complaint, Plaintiffs no longer allege that Defendant personally killed Winston Cabello with a *corvo.* Thus, accepting the facts alleged in the Second Amended Complaint as true, the Court must determine whether Defendant may be held liable under the ATCA for indirectly participating in a common scheme or conspiracy, or aiding and abetting others, in committing the alleged abuses. Although the Eleventh Circuit apparently has not addressed this issue directly, many federal courts have recognized that the ATCA reaches conspiracies and accomplice liability. *See Hilao v. Estate of Marcos,* 103 F.3d 767, 776 (9th Cir.1996) (affirming district court's jury instruction allowing foreign leader to be held liable upon finding that he "directed, ordered, conspired with, or aided the military in torture, summary execution, and 'disappearance'"); *Mehinovic v. Vuckovic,* No. CIV.A.1:98–CV–2470–M, 2002 WL 851751, at *24–25 (N.D.Ga. Apr. 29, 2002) (holding defendant liable for aiding and abetting in acts that violate customary international law); *Eastman Kodak Co. v. Kavlin,* 978 F.Supp. 1078, 1091–92 (S.D.Fla.1997) (asserting ATCA jurisdiction over claim of conspiracy between private defendant and state actors to cause plaintiff's arbitrary and inhuman detention); *Doe v. Unocal Corp.,* 963 F.Supp. 880, 889–90 (C.D.Cal.1997) (permitting ATCA jurisdiction over plaintiffs' allegations that defendants conspired to commit violations of international law); *cf. Abebe–Jira v. Negewo,* 72 F.3d 844, 845–48 (11th Cir.1996) (affirming verdict for torture and cruel, inhuman or degrading treatment where defendant supervised or participated with others in "some of the acts of torture" against plaintiffs); *Carmichael v. United Tech. Corp.,* 835 F.2d 109, 113 (5th Cir.1988) (assuming, but not deciding, that "the ATCA does confer subject matter jurisdiction over private parties who conspire in, or aid and abet, official acts of torture by one nation against the citizens of another nation").

The Senate Report on the TVPA makes clear that the statute is intended to apply to those who "ordered, abetted, or assisted in the violation." S. REP. NO. 02–249, at 8–9 (1991 WL 258662). The Report states

> Under international law, responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts—anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them.

*Id.* at 9.

The Report finds its authority in various international agreements. *Id.* at 9 n. 16. For instance, Article 4 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Torture Convention") provides: "Each State Party shall ensure that all acts of torture are offenses under its criminal law. The same shall apply to an attempt to commit torture and to an act by any person which constitutes complicity or participation in the torture." Similarly, Article 3 of the Inter–American Convention to Prevent and Punish Torture provides: "The following shall be held guilty of the crime of torture: (a) A public servant or employee who, acting in that capacity, orders, instigates or induces the use of torture, or directly commits it or who, being able to prevent it, fails to do so." Finally, the Report provides that "low-level officials cannot escape liability by claiming that they were acting under orders of superiors," as Article 2(3) of the Torture Convention explicitly provides that, "[a]n order from a superior official or a public authority may not be invoked as a justifi-

cation for torture." S. REP. NO. 102–249, at *9.

Other international conventions similarly provide that those who assist in the commission of acts prohibited by international law may be held individually responsible. For instance, Article 7(1) of the International Criminal Tribunal for the former Yugoslavia ("ICTY") Statute states that "[a] person who planned, instigated, ordered, committed or otherwise aided and abetted in the planning, preparation or execution of a crime referred to in Articles 2 to 5 of the present statute [grave breaches of the Geneva Conventions of 1949, violations of the laws or customs of war, genocide or crimes against humanity] shall be individually responsible for the crime." Article 7(1) also provides that "[t]he fact that an accused person acted pursuant to an order of a Government or of a superior shall not relieve him of criminal responsibility."

In *Prosecutor v. Tadic,* Case No. IT–94–1–A, Judgement (Appellate Chamber, July 15, 1999), the Appeals Chamber of the International Tribunal for Cases Regarding the Former Yugoslavia held that "the notion of common design as a form of accomplice liability is firmly established in customary international law and . . . in the [ICTY Statute]." *Tadic* ¶ 220. Under Article 7(1), "Whoever contributes to the commission of crimes by a group of persons or some members of the group, in execution of a common criminal purpose, may be held to be criminally liable, subject to certain conditions. . ." *Id.* ¶ 190. As the court explained:

> The above interpretation is not only dictated by the object and purpose of the Statute but is also warranted by the very nature of many international crimes which are committed most commonly during wartime situations. Most of the times these crimes do not result from the criminal propensity of single individuals but constitute manifestations of collective criminality: the crimes are often carried out by groups of individuals acting in pursuance of a common criminal design. Although only some members of the group may physically perpetrate the criminal act (murder . . . etc.), the participation and contribution of the other members of the group is often vital in facilitating the commission of the offense in question. It follows that the moral gravity of such participation is often no less—or indeed no different—from that of those actually carrying out the acts in question.

*Id.* ¶ 191.

 The Court agrees that principles of conspiracy and accomplice liability are well established in customary international law, set forth in all of the sources discussed above. The ATCA is the legal means by which individuals who violate well-established international law may be held liable in United States courts. Congress has clearly indicated its intent to provide federal courts as a forum to bring to justice individuals who contribute directly to human rights abuses, even where it cannot be shown that an individual actually committed the acts of abuse. Accordingly, the Court determines as a matter of law that Defendant may be held liable under the ATCA for conspiring in or aiding and abetting the actions taken by other Chilean military officials, contrary to international law, with respect to Plaintiffs' decedent. Presently, Plaintiffs have alleged sufficient participation by Defendant to avoid dismissal of the Second Amended Complaint.

### C. Standing of Legal Representative of Decedent's Estate

In the August 10, 2001 Order, the Court dismissed all claims brought by the Estate of Winston Cabello for lack of standing, based on the Court's finding that both federal and Florida law contemplate that

representatives bring lawsuits on behalf of estates. (D.E. 120 at 1.) In the Amended Complaint, Zita Cabello Barrueto, as legal representative of the estate, brought a claim for extrajudicial killing. Neither party disputed that legal representatives may recover under the TVPA for an extrajudicial killing, and the Court found that the State of Florida had declared Zita Cabello Barrueto qualified as decedent's legal representative under Florida law. In the Second Amended Complaint, Zita Cabello Barrueto, in her capacity as legal representative of the estate, also alleges claims for torture, crimes against humanity, and cruel, inhuman or degrading treatment. Defendant argues that she lacks standing because under Chilean law, the decedent's wife and children are the only possible legal representatives of the decedent, and that only the actual victim of torture can bring an action for torture under the TVPA.

First, the Court rejects Defendant's assertion that Chilean law governs the issue of who qualifies as the decedent's "legal representative." As the Court determined in the previous Order, Plaintiff Zita Cabello Barrueta is qualified as the legal representative of the Estate of Winston Cabello under Florida law for the purpose of bringing an action under the ATCA. Defendant has provided no compelling reason for the Court to reconsider this ruling.

Second, the Court addresses Defendant's argument that the TVPA precludes recovery on a torture claim by the victim's representative.[8] Defendant reasons that because section 2(a)(2) of the TVPA explicitly provides that a claim for "extrajudicial killing" may be brought by the "individu-al's legal representative," whereas section 2(a)(1) provides that a defendant can be liable for a claim of torture "to that individual," it follows that only the actual victim of torture can sue under section 2(a)(1) the TVPA. Plaintiff counters that the phrase "to that individual" is intended to prevent third parties, such as family members, from suing for claims of torture, rather than to preclude the decedent's surviving legal representative from recovering.

Looking to the legislative history, the Court finds that Defendant's interpretation of the TVPA, while not implausible, is overly restrictive. The House Report provides that the TVPA "authorizes the Federal courts to hear cases brought by *or on behalf of* a victim of any individual who subjects a person to torture or extrajudicial killing." H.R. REP. NO. 102–367(I), 1992 U.S.C.C.A.N. 84, 87 (emphasis added). The Senate Report states:

> The legislation permits suit by the victim or the victim's legal representative or a beneficiary in a wrongful death action. The term "legal representative" is used only to include situations in which the executor or executrix of the decedent's estate is suing or in which an individual is appearing in court as a "friend" of the victim because of the victim's mental or physical incapacity or youthful age. The term "beneficiary in a wrongful death action" is generally intended to those persons recognized as legal claimants in a wrongful death action under Anglo–American law.

S. REP. NO. 102–249, at *7.

 In view of the legislative history, the Court finds that Congress intended to

---

**8.** The TVPA provides, in relevant part: "An individual who, under actual or apparent authority, or color of law, of any foreign nation(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or (2) subjects an individual to an extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death." 28 U.S.C. § 1350 note, § 2.

allow the surviving legal representative of a deceased torture victim to recover on behalf of the victim's estate. As noted recently by the Southern District of New York, Defendant's interpretation would allow the most egregious violations of section 2(a)(1)—torture resulting in death or rendering the victim incompetent—to go unaddressed by the TVPA. *See Wiwa v. Royal Dutch Petrol. Co.*, No. 96 CIV. 8386(KMW), 2002 WL 319887, at *16 (S.D.N.Y.2002). Such a result would not contribute to the TVPA's purpose of "making sure that torturers and death squads no longer have a safe haven in the United States." S. REP. NO. 102–249, at *3. Therefore, the Court finds that Plaintiff Zita Cabello Barrueta has standing as the legal representative of the Estate of Winston Cabello, to bring the claims alleged in her representative capacity in the Second Amended Complaint. Accordingly, it is

**ORDERED AND ADJUDGED** that the Motion to Dismiss Second Amended Complaint (D.E.136), filed November 2, 2001 by Defendant Armando Fernández Larios, is **DENIED.**