RANDOLPH, Circuit Judge,
concurring:
I write separately to add two other grounds for rejecting the detainees’ non-habeas claims. But first some words are in order regarding the Alien Tort Act, 28 U.S.C. § 1350:
The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.
Three courts of appeals have decided that § 1350 not only provides a federal forum but also creates a cause of action for violations of the “law of nations.” The Second Circuit, in the decision launching this development, held first, that § 1350 conferred jurisdiction over an action by citizens of Paraguay against another citizen of that country for torts allegedly committed in Paraguay; and second, that “customary international law” is part of federal common law. Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980). The same court of appeals later reiterated that § 1350 provided jurisdiction and gave aliens - in this instance, Muslim and Croat citizens of Bosnia-Herzegovina - a cause of action against the leader of the Bosnia Serbs for violations of “the law of nations” and treaties. Kadic v. Karadzic, 70 F.3d 232, 241-44 (2d Cir.1995); see Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 92-93 (2d Cir.2000). The Ninth Circuit followed suit, holding that § 1350 gave a district court jurisdiction over the estate of the former Philippine President Marcos although all plaintiffs and defendants were Philippine nationals and although the torts, alleged to violate international law, occurred entirely in the Philippines.. Trajano v. Marcos (In re Estate of Ferdinand E. Marcos Human Rights Litigation), 978 F.2d 493, 499 (9th Cir.1992); see also Hilao v. Estate of Marcos (In re Estate of Ferdinand Marcos, Human Rights Litigation), 25 F.3d 1467, 1473 (9th Cir.1994); Martinez v. City of Los Angeles, 141 F.3d 1373, 1383-84 (9th Cir.1998). The Eleventh Circuit joined *1146 these courts of appeals in holding that § 1350 not only confers jurisdiction, but also gives federal courts the power to “fashion domestic common law remedies to give effect to violations of customary international law.” Abebe-Jira v. Negewo, 72 F.3d 844, 847 (11th Cir.1996).
The meaning of § 1350 has been an open question in our court. See Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 777 (D.C.Cir.1984) (Edwards, J., concurring); id. at 800 (Bork, J., concurring); Sanchez-Espinoza v. Reagan, 770 F.2d 202, 206-07 (D.C.Cir.1985). But what § 1350 does not mean has been decided. In the Tel-Oren case both Judge Bork and Judge Robb, in their separate concurring opinions, rejected the Second Circuit’s Fi-lartiga decision, Judge Bork on the ground that § 1350 does not create a cause of action, Judge Robb on the ground that Filartiga is “fundamentally at odds with the reality of the international structure and with the role of United States courts within that structure.” See 726 F.2d at 801 (Bork, J.); id. at 826 n. 5 (Robb, J.). Since then some of the opinions following Filartiga maintain that Congress ratified its interpretation of § 1350. See, e.g., Kadic, 70 F.3d at 241; Hilao, 25 F.3d at 1475; Abebe-Jira, 72 F.3d at 848; see also William S. Dodge, The Historical Origins of the Alien Tort Statute: A Response to the “Originalists,” 19 Hastings Int’l & Comp. L.Rev. 221, 224, 256 (1996). The ratification argument rests on enactment of the Torture Victim Protection Act of 1991, which provides a cause of action for damages to anyone - aliens and citizens alike - who suffered torture anywhere in the world at the hands of any individual acting under the law of any foreign nation. 28 U.S.C. § 1350 note. The Torture Victim Act does not contain its own jurisdictional provision. But it is clear that any case brought pursuant to that statute would arise under federal law and thus come within 28 U.S.C. § 1331, the grant of general federal question jurisdiction. (I mean to imply nothing about the constitutionality of the statute.) The Alien Tort Act is thus beside the point: it confers jurisdiction only over suits by aliens and only for violations of treaties and the law of nations. The House Report on the torture victim bill did state that § 1350 “should remain intact to permit suits based on other norms that already exist or may ripen in the future into the rules of customary international law.” Torture Victim Protection Act of 1991, H.R.Rep. No. 102-367, pt. 1, at 4 (1991). But the statement of one congressional committee is by no means a statement of “Congress,” as some have supposed; the wish expressed in the committee’s statement is reflected in no language Congress enacted; it does not purport to rest on an interpretation of § 1350; and the statement itself is legislative dictum.
The detainees, or at least some of them, nevertheless have urged us to follow the Filartiga line of cases. I see a number of problems in doing so, in addition to those mentioned by Judges Bork and Robb in Tel-Oren. To hold that the Alien Tort Act creates a cause of action for treaty violations, as the Filartiga decisions indicate, would be to grant aliens greater rights in the nation’s courts than American citizens enjoy. Treaties do not generally create rights privately enforceable in the courts. Without authorizing legislation, individuals may sue for treaty violations only if the treaty is self-executing. See, e.g., Foster v. Neilson, 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829) (Marshall, C.J.); McKesson HBOC, Inc. v. Islamic Republic of Iran, 271 F.3d 1101, 1107 (D.C.Cir.2001); Princz v. Federal Republic of Germany, 26 F.3d 1166, 1174 n. 1 (D.C.Cir.1994); Holmes v. Laird, 459 F.2d 1211, 1220 (D.C.C3r.l972); Tel-Oren, 726 F.2d at 808-10 (Bork, J., *1147 concurring). To illustrate, the detainees in this case claim that the military is confining them in violation of the Geneva Convention of 1949. But the second Geneva Convention, like the first, see Eisentrager, 339 U.S. at 789 n. 14, 70 S.Ct. at 949 n. 14, is not self-executing for the reasons stated by Judge Bork in Tel-Oren, 726 F.2d at 808-09, and by the Fourth Circuit in Hamdi v. Rumsfeld, 316 F.3d 450, 468-69 (4th Cir.2003). No American citizen, therefore, has a cause of action under this treaty. Yet on the basis of Filartiga, and the theory that the Alien Tort Act itself creates a cause of action, aliens could bring suit for its violation. Martinez, 141 F.3d at 1383-84, illustrates the point. The Ninth Circuit, relying on § 1350, sustained such a suit, brought by an alien against the City of Los Angeles for actions occurring in Mexico in violation of the “customary international law.” The court of appeals derived this “customary international law” partly from the International Covenant on Civil and Political Rights. But the court neglected to mention that this multilateral agreement creates no judicially enforceable rights and that the Senate ratified the treaty on the basis that it “will not create a private cause of action in U.S. courts.” S. Exec. Rep. No. 102-23, at 9, 19, 23 (1992). I find it hard to believe the First Congress, which enacted the Alien Tort Act in 1789, intended to extend to aliens rights of actions withheld from the citizens of this country.
Filartiga’s theory that federal common law incorporates customary international law also raises many issues. The theory was necessary to sustain the constitutionality of § 1350 as the Second Circuit interpreted and applied it. Early in our history the Supreme Court held unconstitutional, in violation of Article III, the conferring of federal jurisdiction over suits by an alien against an alien. Hodgson v. Bowerbank, 9 U.S. (5 Cranch) 303, 304, 3 L.Ed. 108 (1809). In holding that federal common law somehow incorporates customary international law, the Filartiga court placed the case before it on the “arising under” head of jurisdiction without mentioning Hodgson. See Illinois v. City of Milwaukee, 406 U.S. 91, 100, 92 S.Ct. 1385, 1391, 31 L.Ed.2d 712 (1972). This avoided the difficulty the Supreme Court’s decision posed, but it created quite a few difficulties of its own.
For one thing, Article I, section 8, clause 10 of the Constitution gives Congress the power to “define and punish ... Offenses against the Law of Nations.” The Framers’ original draft merely stated that Congress had the power to punish offenses against the law of nations, but when Gou-verneur Morris of Pennsylvania objected that the law of nations was “often too vague and deficient to be a rule,” the clause was amended to its present form. Ill Elliot’s Debates in the FedeRal Convention of 1787 as Reported by James Madison 604 (James McClellan & M.E. Bradford eds., rev. ed.1989). I believe this clause in Article I, section 8, particularly in light of the history just recounted, makes it abundantly clear that Congress - not the Judiciary - is to determine, through legislation, what international law is and what violations of it ought to be cognizable in the courts. Yet under Filar-tiga, it is the courts, not Congress who decide both questions. It is no answer to say that early Supreme Court cases looked to the “law of nations.” The “law of nations” may have been part of the general federal common law in the days before Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), but even then “the law of nations” did not present “any Federal question.” N.Y. Life Ins. Co. v. Hendren, 92 U.S. 286, 286-87, 23 L.Ed. 709 (1875); see Oliver Am. Trading Co. v. Mexico, 264 U.S. 440, 442-43, 44 *1148 S.Ct. 390, 390-91, 68 L.Ed. 778 (1924). And for good reason. The political branches of our government may influence but they by no means control the development of customary international law. To have federal courts discover it among the writings of those considered experts in international law and in treaties the Senate may or may not have ratified is antidemocratic and at odds with principles of separation of powers. As Judge Robb put it, the courts “ought not serve as debating clubs for professors willing to argue over what is or what is not an accepted violation of the law of nations.” Tel-Oren, 726 F.2d at 827 (Robb, J., concurring). Nothing in the Constitution expressly authorizes such free-wheeling judicial power. After Erie brought an end to “general federal common law,” federal common law has been mostly interstitial or generated by the need for uniformity throughout the States. See generally HenRY J. Friendly, BenchMarks 155-95 (1967). A federal common law of customary international law is justified by neither consideration. Congress, when it ratifies treaties, often does so with reservations in order to avoid altering domestic law. Yet treating customary international law as federal law would alter domestic law because of the Supremacy Clause. All of these problems, and more, including the lack of historical support for the Filartiga theory, are spelled out in Curtis A. Bradley & Jack L. Goldsmith, Customary International Law as Federal Common Law: A Critique of the Modem Position, 110 Harv. L.Rev. 815 (1997), and in a later article by the same authors, Federal Courts and the Incorporation of International Law, 111 Harv. L.Rev. 2260 (1998). But see Harold Hongju Koh, Is International Law Really State Law?, 111 Harv. L. Rev. 1824 (1998).
As to the history of the Alien Tort Act, Judge Friendly wrote: this “old but little used section is a kind of legal Lohengrin; although it has been with us since the first Judiciary Act, § 9, 1 Stat. 73, 77 (1789), no one seems to know whence it came.” IIT v. Vencap, Ltd., 519 F.2d 1001, 1015 (2d Cir.1975). The original version read:
the district courts ... shall also have cognizance, concurrent with the courts of the several States, or the circuit courts, as the case may be, of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States.
1 Stat. 73, 76-77 (1789). Two former members of our court thought that § 1350 might have been meant to cover only private, nongovernmental acts taken against aliens such as piracy. Sanchez-Espinoza, 770 F.2d at 206 (Scalia, J.); Tel-Oren, 726 F.2d at 813-14, 822 (Bork, J., concurring). “[M]ore recent research of a competent scholar” (Erie R.R., 304 U.S. at 72, 58 S.Ct. at 819) has shed new light on the origin of § 1350 and the purpose of the First Congress in enacting it. See Joseph Modeste Sweeney, A Tort Only in Violation of the Law of Nations, 18 Hastings Int’l & Comp. L.Rev. 445 (1995). Professor Sweeney marshals a vast amount of historical research on eighteenth century “prize law,” which allowed private vessels having a marque to capture enemy ships. When the Articles of Confederation were in effect, state courts adjudicated claims by alien shipowners seeking the return of their captured vessels and reparations for the damages caused by the seizure. Adoption of the Constitution and the passage of the First Judiciary Act gave the federal courts exclusive jurisdiction in admiralty and thus exclusive jurisdiction over suits brought to recover ships captured in prize. There was still a question whether state courts had jurisdiction over cases in which the alien sued not for return of the ship, but only for reparations. It was only these cases, Professor Sweeney postulates, *1149 that the Alien Tort Act’s author, Oliver Ellsworth, and his congressional colleagues, intended to cover by making clear that if the alien shipowner’s suit sought only reparations, the state courts would have jurisdiction concurrent with the federal courts. Hence the words in the statute “for a tort only.” If Professor Sweeney is correct, the Alien Tort Act today is moribund, as in fact it had been for nearly two hundred years until the Second Circuit resuscitated it.
In view of my doubts about Filartiga, and the Tel-Oren majority’s rejection of it, we might go ahead in this case and decide what § 1350 does mean. But it is unnecessary to do so, not only because Eisentrager disposes of the cases, but also because the detainees’ treaty and international law claims are barred by sovereign immunity. Before explaining why, I need to add a disclaimer. At oral argument, the question arose whether next friend status may be recognized for suits under § 1350. “Some courts have permitted ‘next friends’ to prosecute actions outside the habeas corpus context on behalf of infants, other minors, and adult mental incompetents.” Whitmore v. Arkansas, 495 U.S. 149, 162 n. 4, 110 S.Ct. 1717, 1727 n. 4, 109 L.Ed.2d 135 (1990). Here, the argument for the next friend device is that the detainees are allegedly barred from talking with anyone about bringing lawsuits on their behalf. The parties have not briefed the questions this argument raises and I express no opinion on its validity.
The United States or its officers may be sued only if there is a waiver of sovereign immunity. See, e.g., Dep’t of Army v. Blue Fox, Inc., 525 U.S. 255, 260, 119 S.Ct. 687, 690-91, 142 L.Ed.2d 718 (1999). We have held that the Alien Tort Act, whatever its meaning, does not itself waive sovereign immunity. Industria Panificadora, S.A. v. United States, 957 F.2d 886, 886 (D.C.Cir.1992) (per curiam); Sanchez-Espinoza, 770 F.2d at 207; see Canadian Transp. Co. v. United States, 663 F.2d 1081, 1092 (D.C.Cir.1980). The detainees therefore rely on the waiver provision in the Administrative Procedure Act, 5 U.S.C. § 702, which states: “An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity ... shall not be dismissed ... on the ground that it is against the United States....”
Although relying on the APA’s waiver for agencies, the detainees do not identify which “agency” of the United States they have in mind. They have sued the President in each case, but the President is not an “agency” under the APA and the waiver of sovereign immunity thus does not apply to him. See Franklin v. Massachusetts, 505 U.S. 788, 800-01, 112 S.Ct. 2767, 2775-76, 120 L.Ed.2d 636 (1992); Armstrong v. Bush, 924 F.2d 282, 289 (D.C.Cir. 1991). This leaves the military. The APA specifically excludes from its definition of “agency” certain functions, among which is “military authority exercised in the field in time of war or in occupied territory.” 5 U.S.C. §§ 551(1)(G), 701(b)(1)(G); see id. §§ 553(a)(1) & 554(a)(4), exempting military “functions” from the APA’s requirements for rulemaking and adjudication; United States ex rel. Schonbrun v. Commanding Officer, 403 F.2d 371, 375 n. 2 (2d Cir.1968) (Friendly, J.). The district court ruled, in an alternative holding, that because of the military function exclusion, the APA does not waive sovereign immunity. Rasul v. Bush, 215 F.Supp.2d 55, 64 n. 10 (D.D.C.2002). I believe this is correct.
Each of the detainees, according.to their pleadings, was taken into custody by American armed forces “in the field in *1150 time of war.” I believe they remain in custody “in the field in time of war.” It is of no moment that they are now thousands of miles from Afghanistan. Their detention is for a purpose relating to ongoing military operations and they are being held at a military base outside the sovereign territory of the United States. The historical meaning of “in the field” was not restricted to the field of battle. It applied as well to “organized camps stationed in remote places where civil courts did not exist,” Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 274, 80 S.Ct. 311, 324, 4 L.Ed.2d 268 (1960) (Whittaker, J., joined by Stewart, J., concurring in part and dissenting in part). To allow judicial inquiry "into military decisions after those captured have been moved to a “safe” location would interfere with military functions in a manner the APA’s exclusion meant to forbid. We acknowledged as much in Doe v. Sullivan, 938 F.2d 1370, 1380 (D.C.Cir.1991), when then-Judge Ruth Bader Ginsburg stated for the court that the APA’s military function exclusion applied to cases in which a court was asked to “review military commands made ... in the aftermath of [ ] battle.” It is also of no moment that the detainees were captured without Congress having declared war against any foreign state. “Time of war,” as the APA uses it, is not so confined. The military actions ordered by the President, with the approval of Congress, are continuing; those military actions are part of the war against the al Qaeda terrorist network; and those actions constitute “war,” not necessarily as the Constitution uses the word, but as the APA uses it. See Campbell v. Clinton, 203 F.3d 19, 29-30 (D.C.Cir.2000) (Randolph, J., concurring in the judgment); Mitchell v. Laird, 488 F.2d 611, 613 (D.C.Cir.1973). The detainees are right not to contest this point. To hold that it is not “war” in the APA sense when the United States commits its armed forces into combat without a formal congressional declaration of war would potentially thrust the judiciary into reviewing military decision-making in places and times the APA excluded from its coverage.
I would therefore hold that the detainees cannot invoke the APA’s waiver of sovereign immunity and that the district court correctly dismissed their claims under the Alien Tort Act for this additional reason.
I would also hold that the judicial review provisions of the APA, including the waiver of sovereign immunity, do not apply because the military decisions challenged here are “committed to agency discretion by law.” 5 U.S.C. § 701(a)(2). This exclusion applies when “a court would have no meaningful standard against which to judge the agency’s exercise of discretion.” Heckler v. Chaney, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). The military’s judgment about how to con-fíne the detainees necessarily depends upon “ ‘a complicated balancing of a number of factors which are particularly within its expertise.’ ” Lincoln v. Vigil, 508 U.S. 182, 193, 113 S.Ct. 2024, 2031, 124 L.Ed.2d 101 (1993) (quoting Heckler, 470 U.S. at 831, 105 S.Ct. at 1655-56). The level of threat a detainee poses to United States interests, the amount of intelligence a detainee might be able to provide, the conditions under which the detainee may be willing to cooperate, the disruption visits from family members and lawyers might cause - these types of judgments have traditionally been left to the exclusive discretion of the' Executive Branch, and there they should remain. See Nat’l Fed’n of Fed. Employees v. United States, 905 F.2d 400, 406 (D.C.Cir.1990); Schonbrun, 403 F.2d at 375 n. 2.